# Wytheville.

## TILLEY v. COMMONWEALTH.

### June 23d, 1892.

1. HOMICIDE—*Murder in first degree—Case at bar.*—Prisoner and deceased, his mistress, left their companions in a public road, in the afternoon, and disappeared in the woods. She had about $30 (part silver) in a purse. She was never seen alive afterwards. An hour later he was seen half a mile from where her body was found, and avoided recognition. He left the state that night, and did not return for several years. Her body was found in a secluded place in the woods, partly consumed by fire, with a bullet-hole in her head, such as would be made by a ball from the pistol then in his possession. The coin and purse could not be found. He gave a false name at the place where he stayed that night, and when arrested several years afterwards.

HELD:

     The verdict of guilty of murder in the first degree should not be disturbed, as the circumstances show that robbery was the motive for the homicide.

2. EVIDENCE—*Res gestæ.*—The commonwealth was properly allowed to prove as part of the *res gestæ* that on the day of her death the deceased was on her way to a neighbor's house, near which her body was found.

3. DEFECTIVE PLEA.—A plea that the indictment was found by a defectively impanelled grand jury, wherein no defect was specified, was properly rejected.

Error to judgment of circuit court of Carroll county, rendered April 5th, 1891, whereby Robert Leake Tilley, the plaintiff in error, was sentenced to death by hanging, in accordance with the verdict of the jury in the trial of an indictment against him for the murder in the first degree of one Lou Haynes. Opinion states the case.

*James A. Walker*, for plaintiff in error.

*Attorney-General R. Taylor Scott*, for commonwealth.

LACY, J., delivered the opinion of the court.

The plaintiff in error was indicted in the county court of Carroll on the 21st day of November, 1887, but, being at large, was not apprehended for several years, when he was arrested in the state of Kentucky, and brought back for trial. At his arraignment he elected to be tried in the circuit court for said county of Carroll, and his case was removed to that court, with the result stated. At the trial he excepted to sundry rulings of the court against him, and, upon his conviction there, applied for and obtained a writ of error to this court.

The first error assigned in this court is that the circuit court erred in overruling his motion in arrest of judgment, and to the action of said court in overruling his motion to set aside the verdict and grant him a new trial, upon the ground that the verdict was contrary to the law and the evidence.

By the certificate of facts, it appears that it was proved by the commonwealth that on the 17th day of November, 1887, the dead body of Louisa Haynes was found in Carroll county, Va., with a bullet wound, made by a large ball, in the top of her head, which ball came out in her jaw, breaking the bones; and that the body was partially consumed by fire. That the charred remains were found in the lap of a tree, which had been blown up by the roots, about three quarters of a mile from the Fancy Gap road, and 154 yards from the Green Hill road, in a secluded hollow in the woods, by the side of an old road used by the owner of the lands as a wood road, and 200 yards from a house occupied by a family, but which spot was not in sight of the said house on account of an intervening hill. That death was caused by the bullet wound. That the body of the deceased was found lying on her face, with left arm under the body and the right hand drawn back above or behind her body. That, on or about the 10th of November, the prisoner, with his brother,

came through Bristol, Tenn., on their way to North Carolina, where their mother lived, close to the Virginia state line. That prisoner and deceased had lived in the same neighborhood in North Carolina and Virginia, and had known each other from youth ; but that the prisoner had been absent from home two or three years, living in Kentucky ; and the deceased, with her father's family, had moved to Bristol about December, 1886. That in passing through Bristol, in November, 1889, the prisoner heard that the Haynes were living there, and called to see them ; and about the 12th of the month the prisoner, his brother, the deceased woman, and another young woman, named Susan Dean, who had removed from North Carolina to Bristol a few months before, and who had known deceased and prisoner nearly all her life, started from Bristol to their old home in North Carolina. That deceased had some $30 or $40 in money when she left Bristol. That they came from Bristol to Wytheville, Va., on the railroad train, prisoner paying fare of deceased. They arrived in Wytheville in the morning, and the prisoner and deceased and the other young woman stayed until the next morning, which was Sunday, and the three walked from Wytheville, camping out all night Sunday night near Carroll Courthouse, because they could find no place to stay. That they came to the said Courthouse Monday morning, and got breakfast at an hotel, the deceased paying the bill. That from the Courthouse the three went on afoot (except that they rode in a wagon, which overtook them on the way, for a few miles) to the residence of James Dean, an uncle to both the girls, and who resided on the Fancy Gap road, about two miles from the state line. At that point the prisoner left them, and the two girls stayed at Dean's until the next morning, when they went into North Carolina, about a mile or two from the line, the deceased going to the house of one McMillan, and the other girl going to the house of one Phillips. That McMillan and Phillips

both lived in North Carolina, and about a half a mile apart. That deceased remained at McMillan's until Wednesday night after dark, when she left, and about 8 or 9 o'clock in the night came to the house of Phillips, after the family had retired ; but when she knocked at the door some one got up and let her in ; and that a few minutes after deceased was let into the house the prisoner and his brother James came to the house, and remained all night at Phillips' house. That while at Phillips' house the prisoner asked for something to eat, and a daughter of Phillips got some bread and meat for him, which he ate. That about 10 or 11 o'clock Mr. Phillips, who was in bed, said it was time all honest folks were in bed, and he wanted to sleep, as he had to work next day ; and the prisoner said " Yes," and immediately left. The next morning a man named John Day came to Phillips' house, and after deceased started to go back to McMillan's house, and had gone fifteen steps, said Day called to her, and they had a short conversation, and went a very short distance together, and then parted, going in different directions. Lou Haynes said that she was going that day to the house of a woman named Margaret Myricks. On Wednesday deceased had $30 in paper money and some silver coin in a velvet purse, which she carried on her arm by a steel chain. That deceased had been working in a tobacco factory in Bristol, getting $1.25 a day, but the factory had stopped work, and she had been employed as chamber-maid at an hotel in Bristol for two months before she left there. That on Thursday morning, after deceased had left Phillips' house, and about 9 o'clock A. M., the prisoner came there and stayed a short while and then left. About the middle of the forenoon prisoner was on the Fancy Gap road in North Carolina, talking to Sue Dean and Mary Phillips, and two men came up the road, and some one said that one of them was Fulton, a person with whom prisoner had had a serious difficulty at the house of deceased's

father several years before; and prisoner then pulled out a large pistol from his hip-pocket and put it into his breast-pocket, and remarked: "If Fulton raises a fuss with me, I will make a d—d short work of him." When she left Phillips' house on Thursday morning she said she was going to Jeff McMillan's and Margaret Myricks'. The deceased remained at McMillan's house until Thursday until after dinner, and that soon after dinner she, accompanied by Eliza McMillan, walked together up the Fancy Gap road towards the Virginia line. That between McMillan's and the line they were joined by the prisoner and his two brothers, Joseph and James Tilley, and that all five went as far as the state line, laughing and talking, and that all remained there, seated on a log, for some time; and that between 3 and 4 o'clock P. M. the deceased and the prisoner started up the Fancy Gap road into Virginia, and the other three went back towards the North Carolina line, along the same road, to the house of the other young woman, about two and a half miles, reaching her home awhile before sun-down ; and that was the last ever seen of the deceased alive. That there was no quarrel or bad feeling between deceased and the prisoner, and they appeared to be good friends. From the state line to where the body of the deceased was found, by the roads, was over one and a half miles, but that there was a blind road or path, grown up in bushes, a part of the distance, but which could be travelled by persons on foot, which left the Fancy Gap road at the chestnut log at the state line, and came out into the Green Hill road 150 or 200 yards nearer the Fancy Gap road than where the old road, on which the body was found, turned out from the Green Hill road; and that by this blind path or road it was about one half mile in a straight line to the Green Hill road. That on the Green Hill road, between the point where the wood road, on which the body was found, left the Green Hill road, and in the direction of

the Fancy Gap road, for a distance of about 200 yards, there were to be seen, on the next morning (Friday) after the body was found, the tracks of a man and a woman on opposite sides of the road, going in the same direction, and towards the old wood road; but no tracks were seen on the wood road. That the woman's track was about a No. 4, and the man's track an 8 or 9, and looked as if made by a heavy, coarse brogan boot or shoe; and that there were also seen at the same time the tracks of two men along the same distance, and also again near the Fancy Gap road, going in the opposite direction from the woman's track; and that all three of the men's tracks were about the same size and general appearance. It was also proved that while the five persons were at the chestnut log, near the state line, one Smith passed, going in the direction of Virginia, with a one-horse wagon; and that it was at least as late as 3 o'clock P. M. when he passed them, and sold one of the young men some chestnuts. That Smith drove on slowly, stopping occasionally to breathe his horse, and that when he had gone about three quarters of a mile, and was within 200 yards of the point where the Green Hill road turned off from the Fancy Gap road, he heard the loud report of a rifle or large pistol, in the direction of where the body was found, which he took to be the report of a rifle fired by some hunter, but that he was very hard of hearing; and that no one passed him before he passed the forks of the Green Hill road. That while the parties were at the chestnut log, near the state line, one David Ayres also passed with a wagon, going in an opposite direction from what Smith was going; and that none of the parties who were on the log passed him that evening. It was also proved by Luther Coe that he was with his father, about 200 yards from where the dead body was found; and that on Thursday evening, just about 4 o'clock, he heard a cry of "Oh!" coming from the direction of where the body was found; and in a minute after the cry

he heard the report of a gun or pistol in the direction of the cry, which sounded like a deadened sound, not very loud or clear. That the cry heard by Luther Coe was not the cry of one in pain, distress, or alarm, but just a low cry of " Oh ! " That the cry did not attract his attention particularly at the time he heard it.

It was further proved by the commonwealth that on Thursday evening about sun-down, or a little before, the prisoner was seen coming along the Green Hill road, about one half mile from where the body was found, coming from the direction of the Fancy Gap road, and from where the wood road left the Green Hill road, and going towards Green Hill, walking rapidly ; and that he passed within ten steps of several persons who were gathering corn along the side of the road, but did not speak, and did not seem to care to speak ; and one witness said he rather turned his head away. That none of the parties knew him, except a boy, who had seen him at the school-house the day before. That prisoner was again seen, about sun-down, or a little before, passing along the road leading from Green Hill road towards his mother's residence, which was not more than one fourth of a mile from where he was then seen. It was proved by Mrs. Atkins, who lived over a mile from where the body was found, that on Thursday evening about 4 o'clock she heard the report of a gun or pistol in the direction of Mr. Short's, or of the spot where the body was found. It was further proved that the wagon road on which the body was found led by Coe's fields to Short's plantation, and that this was the nearest way from the point where the wood road left the Green Hill road to Margaret Myricks' ; and that the blind path or road from the chestnut log at the state line to Green Hill road led through a dense woods, across a deep hollow, over a small branch, where an illicit distillery was operated twenty years ago. On the evening of Thursday, November 17, 1887, Mr. Coe, who lived ——

yards from the spot, where the body was found, discovered that the woods were on fire on Mr. Short's land, and he dispatched a messenger for Mr. Short, and went himself, with his boys, and surrounded the fire, which had burnt over about three quarters or half acre of ground. When Mr. Short came they went back to the fire, and saw the body of a human being lying in the lap of a tree, about a foot from the ground, face downwards, with a large bullet-hole in the top of her head and face. A number of buttons and a breast-pin, and other portions of her dress, were raked out of the ashes under her body; but no silver, or steel chain, or finger-rings were found. Her limbs were nearly all burned off, and most of the flesh of her head and face. This body was the body of Lou Haynes, and the remains were guarded all night, and an inquest was held next day; the verdict of the coroner's jury being that the deceased came to her death from the effects of a pistol wound in the head, fired by the prisoner. Many people—a hundred or more—attended the inquest, and there was great excitement and strong threats made of lynching the Tilley boys, and especially the prisoner, and one or two leading and law-abiding citizens spoke to the crowd, urging them not to commit violence, but let the law take its course. Some persons in the crowd got hickory switches and twisted them into a rope with which to hang the prisoner if he came or was brought to the spot. It was also proved that a justice of Carroll county, Va., directed a number of men to go to the house of the prisoner's mother, in North Carolina, about 2½ miles from the spot where the body was lying, and arrest the three Tilley boys—James, Joseph, and the prisoner. They went to the house, found the family at dinner in the cellar of the house, which was used as a dining-room, and, having left two men at the cellar door, the other three went into the room above, being invited in by Joe Tilley. After some slight resistance, they arrested Joe and James Tilley, but saw nothing

of the prisoner, and carried the two arrested to Virginia, the place where the inquest was being held, where they were detained until the coroner's verdict was found, when they were turned loose.

The commonwealth also proved that, after the party who had arrested James and Joseph Tilley had been gone from the house a short while, one or two returned and searched for the prisoner, but he was not there; and that the house stood but a short distance from the woods. On Saturday evening, about sun-down, the prisoner came to the house of one Via, in Patrick county, about twelve miles from Patrick Courthouse, and a mile from Critz depot, on foot, and stayed all night, and seemed restless and uneasy, and gave his name as Robert Harris. He went to bed early, and left next morning in the direction of the railroad. In the month of September, 1890, the prisoner was arrested and committed to jail in Louisa county, Ky., nominally for failure to pay a fine which had been assessed against him several years before for violation of a city ordinance, but in reality to detain him to answer for the murder of the deceased in Virginia, and to obtain the reward offered for his arrest and conviction. The prisoner was well known in Louisa, and went by the name of Tilley when there; but when committed to jail he asked the jailor or sergeant to get a lawyer to come to see him, and the sergeant told one Castle, a lawyer at Louisa, that Bob Tilley wanted him to come to the jail to see him. Castle went to the jail to see the prisoner, who gave his name as John Fleming, and said that he lived at Toledo, Ohio, or some other point in Ohio, the witness could not remember distinctly. Said Castle told the prisoner he would send a telegram to his friends, but prisoner said he lived four or five miles from the city, and a telegram would not reach them. It was understood in the town of Louisa generally that his name was Tilley, though he said to witness

(Castle) that his name was not Tilley; but he said he was raised close to North Carolina. Witness was a lawyer, and he and another lawyer, named Stuart, started to Virginia with the prisoner, and when they got to Catlettsburg, in Kentucky, at the mouth of Big Sandy river, the prisoner, who was hand-cuffed, said he wanted to stop there and consult a lawyer, and see if the persons in charge had papers to bring him out of the state, and said he wanted to see a lawyer named Pritchard. The prisoner rose up in his seat and said he would get off, but witness took hold of the handcuffs and jerked him down. They brought him to Carroll county, and on the way somewhere he said his name was Bob Tilley, and told about his brothers. When he got near Carroll Courthouse he seemed much alarmed, and said he was afraid the people would lynch him, and asked his guards not to let them do so, which they promised. When turned over to the jailor of Carroll county, he told him his name was Robert Tilley. It was proved by the jailor of Carroll that when the prisoner was brought to his jail, October 4th, 1890, he gave his name as Robert Tilley, and that he, on account of rumors of an attempt to release him, had chained his leg to the floor of the jail by a chain about three feet long, and had kept him so chained ever since, while in his custody; but that for one month he was removed to the jail of Montgomery county, Va. While prisoner was confined he had twice very nearly sawed the rivet off the iron band which was around his ankle. On one occasion, when a lot of tools had been given him by another prisoner, with which he might have escaped, he sent for his attorney, and gave them to him. On another occasion the prisoner complained of being unwell and chilly, and asked the jailor to have a fire made; but, on the jailor's refusing, he said he would make one, and the jailor told him if he did, he (the jailor) would see that he was burned up in it.

The prisoner proved by witnesses that he came from

Kentucky in the month of November, 1887, to Bristol, Tenn., on his way to visit his mother, who lived in North Carolina, near the Virginia line. He was accompanied by his brother, Jo Tilley; and that when be got to Bristol, they heard that Littell Haynes and his family, including a single daughter, named Lou, were living in Bristol. The Haynes were old acquaintances of the Tilleys, having lived in the same neighborhood in Carroll county, Va.; and they visited the family in Bristol. They got to Bristol on Wednesday or Thursday; and on Saturday the prisoner and his brother, with Lou Haynes and a girl named Sue Dean, started together to visit their friends in Virginia and North Carolina. The prisoner paid Lou Haynes' railroad fare to Wytheville, and his brother paid Sue Dean's. They got to Wytheville on Saturday morning, and remained all day, and in the afternoon Jo Tilley left the party, and reached his mother's home on Sunday evening. The others stayed in Wytheville all night, and left on Sunday morning. Prisoner bought a new pair of gaiter shoes in Bristol, of fine quality, with very narrow toes and very small heels, and he had no other shoes, and he wore those shoes the day Lou Haynes was killed. The prisoner had $300 in money on Tuesday morning, the day after his arrival at his mother's house. He came to his mother's on Monday evening, and stayed all night, and on Tuesday morning went to Mt. Airy, N. C., returning to his mother's in the evening. He left his mother's on Wednesday morning, and did not return until late Thursday evening. The prisoner and deceased and three others were at the chestnut log when Smith passed. There were violent threats against the prisoner's life at the coroner's inquest, and he would have been killed if he had been taken that day, or in ten days after. He never would have gotten to jail or had a trial. The prisoner came to his mother's house on Thursday evening, about a half an hour before sun-down, and remained there

all night. After breakfast he and his mother went to Green Hill, a little manufacturing town, about three quarters of a mile from their mother's house, and returned about 11 o'clock, and were all seated at the dinner-table, eating dinner, when the party from Virginia came to arrest the Tilley boys. Jo Tilley was just done eating when the men came, and went out first, and invited them into the house. Three of them went into the house, and two remained near the cellar door, in which room the dinner was. Jim Tilley next went out of the cellar and up-stairs. As soon as Jo Tilley and the three men got into the house, Jerre Allen, the leader of the men, said: "I arrest you, Bob Leake Tilley, for the murder of Lou Haynes." Jo said, "That is not my name," and took down a gun, and the others drew pistols, and they had a smart tussle over the gun, and, hearing the noise up-stairs, the two men at the cellar door ran up-stairs to the assistance of their comrades. Mr. Gordon, the stepfather of the Tilley boys, and their mother, Mrs. Gordon, came in, and interposed to stop the fuss, and asked what was the matter; and they said, "Lou Haynes has been murdered, and we believe the Tilley boys did it." None of the family had ever heard of the death of Lou Haynes until then. The prisoner was eating his dinner when the party came to arrest the Tilley boys, and was left in the cellar or dining-room when the rest went out, and was not seen again until about dark, when he came into the yard of his mother's house, where he was met by his mother, by his step-sisters, and by Mr. C. F. Taylor, who told him he would be hung by a mob if arrested, and to leave the country at once—that he would never get a trial; and he did leave in a short time, first eating a lunch, which was carried out to him in the yard. Frank Taylor accompanied prisoner when he left the house, for a short distance, and advised him to leave the country, or he would be lynched. Mrs. Gordon was in the cellar, and when some one in the room above said, "I arrest

you, Bob Leake Tilley, for the murder of Lou Haynes;" and she heard those words, and they were loud enough for any one to hear, but prisoner was then near the door, and she didn't know whether he heard them or not.

We have thus observed these two persons in the light of the evidence from the time that they met by chance, as is claimed, after several years of separation. They had been early acquaintances in their younger days. The prisoner was on his way to visit his mother, at his old home, when, hearing that the deceased was not there, he procured her as a companion on the journey, and spent much of his time in her company, in a manner and under circumstances which cannot be misunderstood. In the late fall season, the 17th of November, between 3 and 4 o'clock P. M., the prisoner and the deceased went together towards the place of her destination. There was a public road which they could have traveled, but, leaving this, they enter the dense forest, along a by-road or blind path, enshrined in bushes, and disappear from view. The deceased is never again seen alive, but the prisoner, in less than an hour, is seen alone, passing in hurried walk along a highway leading towards his mother's house, turning his face away, and avoiding recognition, and failing to speak, although he was on a pleasure trip, doing nothing heretofore but loafing from one house to another, going into one house after bed-time and asking for something to eat, and staying until warned to leave on account of the late hour. Why this haste? Why this sudden desire for concealment? A short time before he had been courting observation on every hand, as if his business was to see and to be seen. Lately a man of leisure and on pleasure bent, what business urged him on now? He was within a few hundred yards of his mother's house, and that was close to the woods. And from this he never emerged until he betook himself to the woods for concealment, in which he wanders for three years

under an assumed name. When the law's avengers came to his mother's house without proclamation of their purpose, his brothers went out to meet the visitors, and invited them in the house; but the prisoner stayed behind, and did not go out. Did he not wish to meet his old neighbors? What had become of his companion? He declines to answer this question, but says he is not his brother's keeper. Without his aid, the commonwealth answers. The body was found in a secluded dell, a short distance from the road on which he traveled so hurriedly, with a large bullet-hole through the head, entering on the top of the head, and partially consumed by fire, in the embrace of the dead branches of a fallen tree. In the ashes under her body they found her trinkets, but the silver money which was in her purse was not there, and the steel chain to her purse was not found. Fire could consume neither. So the circumstances point to robbery. The hole in the top of the head sufficiently bespeaks a violent death—the hand of an assassin. See *Philips' Case*, 19 Gratt. 485. When the whole neighborhood stood guard around those mutilated remains, and the coroner's jury came, where was he? He had betaken himself to the woods; was afraid that he would be lynched. Why should he be lynched? No witness had appeared against him but the dumb, the silent, remains of his late "good friend," as he called her. Had he so soon forgotten her? He doubtless remembered her all too well. Was he a man unarmed and peaceable, and incapable of doing foul deeds? He was armed with a large pistol, which he flourished that day, and with which he threatened to fix a man with whom he had had a difficulty several years before, as soon as the old enemy came in sight. The hole in the head and the ball in the cheek-bone betoken this large pistol, which he carried in his breast as he walked in the secluded hollow in the woods with this unprotected young woman. The shot was heard by persons near by. There were no sounds nor outcry, nor other sounds

or signs of conflict, save a low cry of " Oh ! "—" just a low cry of ' Oh ! ' " the witness said. Where was the prisoner when this hole in the head was made and this shot was fired ? The evidence places him close by, within three quarters of a mile, going towards the fatal spot with her, and on her lips is the declaration that she is going to Myricks', which is a short distance beyond, and which she never reached. The prisoner insists that he had no foul motive. ·But robbery was committed. .She had $30 in money, and he knew it ; and if he had $300 his motive was not his present, pressing need of small sums. But whoever did the deed thought the money worth stealing, and the evidence tends strongly to show that the pistol of the accused was the instrument which caused the death of the deceased, who had been his companion a short time before, and whom he had left about that time, as he was seen alone, and going hastily, all within an hour.

He urges, however, that a shoe track of a man was seen along that road next morning, on the opposite side of the road along which the deceased walked for the last time that evening, which was too large for his track. Whose track was this the evidence does not disclose. Did it have any connection with the deceased ? Was it made at the same time hers was made ? We cannot say. The evidence does not disclose. They appear in the same road, which was a public road, and a short distance from a small manufacturing town. This track was not made by the evidence to play any important part in the case. If the man who made them was keeping company with the deceased, he did not walk by her side, but on the opposite side of the road.

The accused lays great stress on the prejudice which existed against him and the excitement which prevailed. But he was not tried amid these ; but long afterwards—after years of cooling time had intervened. He has been tried, ably defended, but convicted by a jury of his peers ; and we cannot say that

this verdict is without evidence, nor contrary; and we think the court did right to overrule his motion for a new trial on the ground that the verdict is contrary to the law and the evidence.

The second assignment of error is that, although guilty of the murder in question, it was not murder in the first degree, but only murder in the second degree. It is insisted that there is no proof to show murder in the first degree—a willful and deliberate killing; that there is no proof of premeditation nor malice. When last seen together, a few minutes before the killing, when they disappeared together in the shadows of that forest from which the deceased was destined never to emerge, they were good friends; and that we cannot presume the circumstances necessary to make up murder in the first degree. It is true, as argued, that all homicide is presumed to be murder in the second degree by the law; and, if the accused would lower the grade of the crime, the burden is upon him; and, if the commonwealth would raise the grade of the crime to murder in the first degree, then the burden is upon the commonwealth to do this. The commonwealth, to do this, points to the circumstances of the crime. Conceding, for the purposes of this. point, that he is guilty of the homicide, what is the degree under the proved facts? A man armed with a large pistol goes into the woods in company with a young woman, towards the shadows of the evening, on her way to a residence a little over a mile off by the woods path. She never reaches her destination. He hurries away about nightfall, avoiding observation. A fire is discovered in these woods. The neighbors gather to prevent its spread and consequent damage to property, and they find a funeral pile had been erected, and the body of this young woman, with a hole in top of the head, partly consumed by fire; and circumstances which show that her purse and her money had been taken from her. Murder and robbery. Was it in sudden

heat? It was not along the highway, nor in the path she traveled, but, seduced into a dense wooden hollow, out of sight of human habitation or of any traveled road or path, this defenseless woman was killed and robbed and burned. These circumstances point to murder for the purpose of robbery. They were not enemies, but good friends. She was pliant to his will, not able and not disposed to resist him in any degree whatever. It is unreasonable to suppose that she, who had followed him so far, and who had followed him so long to her ruin, made any attack upon him or gave him any offense whatever. There is no motive discoverable or discernible but robbery. Whosoever sprang stealthily upon this young woman, and, assaulting her, fired this ball into the top of her head, and robbed and burned her body, is guilty of murder in the first degree; and, if he is guilty of murder at all, it is murder in the first degree.

As to the assignment of error that the circuit court overruled the motion to quash the *venire facias,* we perceive no error whatever in the same, which appears regular and proper.

The next assignment of error is that the circuit court erred in rejecting the following plea: "And for plea the defendant says that the grand jury which found the indictment against him was not constituted, impanelled, and sworn in the manner required by law; and he prays judgment that the said indictment be abated and quashed." This plea was offered after motion to quash had been overruled, and before plea to the merits, and was not rejected because it was not offered in time, but because it was not such a plea as the commonwealth could respond to. What was the objection to the constitution of the grand jury? The plea is silent. What was wrong about the impanelling of the grand jury, or the swearing of the same not in accordance with the law? The plea does not inform the prosecution. It is, in substance, a motion to quash. It is not a plea in bar. By that plea the defendant shows, by

matter extrinsic of the record, that the indictment is not maintainable; but there is no matter shown here. Bish. Crim. Proc. 742. Pleas in abatement are either founded on some defect apparent on the face of the record, or upon some matter of fact extrinsic of the record, which renders it insufficient. *Id.* 738; *Day* v. *Commonwealth*, 2 Gratt. 562; *Moore* v. *Commonwealth*, 9 Leigh 639; *Commonwealth* v. *Long*, 2 Va. Cas. 318. Whatever supposed defect there was in the constitution of the grand jury, or the impanelling and swearing them, no defect was set forth, and there is no way to answer. There is no charge, and the plea was properly rejected.

The only other ground of error assigned is that the commonwealth was allowed to prove that the deceased, on the day of her death, upon setting forth from a neighbor's house, said she was going to Myricks'. She being found dead in a defile close by the path which led to Myricks' house, this was not error; it was part of the *res gestæ;* it was part of the history of the cause, and it could in no way injure or prejudice the accused, and there was no error in allowing proof of it.

Upon the whole case we see no error, and we are of opinion to affirm the judgment of the circuit court of Carroll county.

JUDGMENT AFFIRMED.