[No. 3560. Decided February 13, 1901.]

THE STATE OF WASHINGTON, *Respondent,* v. CHARLES W. POWER, *Appellant.*

CRIMINAL LAW — MANSLAUGHTER — SUFFICIENCY OF INFORMATION — ALLEGATIONS SETTING UP CRIMINAL ABORTION.

Under Bal. Code, § 7042, which provides that every person who shall unlawfully kill any human being without malice, involuntarily, but in the commission of some unlawful act, shall be deemed guilty of manslaughter, an information charging manslaughter is sufficient thereunder, although it sets up facts constituting the offense of producing a miscarriage, the punishment for which is provided in Bal. Code, § 7068, when such facts are pleaded only for the purpose of charging the killing as having been done in the commission of a prohibited offense and there

is no punishment provided in the statute against producing
miscarriages where death results from the commission of such
acts.

SAME — EVIDENCE — DECLARATION AS RES GESTAE.

In a prosecution for causing death by producing a miscar-
riage, declarations of the deceased, while preparing to leave
home, that she was in trouble and was going to another city to be
treated by defendant, are admissible in evidence as verbal acts,
explanatory of what she was doing and of her purpose, and as
part of the *res gestae* of one portion of the entire transaction,
when restricted by the court as competent only to explain the
purpose of the deceased in leaving home, and as characterizing
her act of going, and explanatory of the nature, character and
object of that act.

EVIDENCE — DYING DECLARATIONS — IN EXTREMIS.

The fact that dying declarations were made two days prior
to the death of the person making them would not render the
declarations inadmissible in evidence, since the rule requiring
it to be shown that the declarations were made while the declar-
ant was *in extremis* does not require that the declarant be actu-
ally breathing her last, when making them, but the rule is satis-
fied where it is shown that the declarant died in the course of
the illness from which she was suffering at the time they were
made, and that the illness from which she was suffering was the
direct and proximate result of the original injury which the
declarations tend to illustrate.

SAME — SENSE OF IMPENDING DEATH.

Dying declarations are admissible in evidence when the court
is satisfied from all the facts and circumstances shown that they
were made under the sense of impending death, notwithstanding
declarant may not have said in specific terms that she was with-
out hope of recovery, or was dying, or going to die, or could not
live any longer.

NEW TRIAL — NEWLY DISCOVERED EVIDENCE — DILIGENCE.

A defendant convicted of manslaughter as the result of an
abortion procured by him was properly denied a new trial on the
ground of newly-discovered evidence, because of lack of reason-
able diligence on his part in procuring the evidence earlier, when
it appeared that the newly-discovered evidence was that of a
nurse whom defendant had employed to care for the deceased,
that he had been at liberty all the time prior to trial and knew the

whereabouts of the nurse, but had never sought and questioned her as to her knowledge concerning matters that would be subject to inquiry at his trial.

CRIMINAL LAW — INSTRUCTIONS — LIABILITY OF PHYSICIANS FOR GROSS NEGLECT.

In a prosecution for manslaughter as the result of a criminal abortion, where the evidence tends to show that the physician had neglected to take proper sanitary precautions in the care of the deceased, a charge to the jury that "when a physician under-takes to attend a sick person, the law imposes upon him the duty of directing the sanitary conditions surrounding the patient, of prescribing the proper medicines and the times and manner of taking, and whatever other appliances and operations necessary to the restoration of health," is applicable to one phase of the case, but does not undertake to define the degree of care and skill required of a physician; and such charge is not misleading when the instructions elsewhere charge the jury as to the criminal liability of a physician for wilful and felonious neglect of a patient.

Appeal from Superior Court, Spokane County.—Hon. LEANDER H. PRATHER, Judge. Affirmed.

S. G. Allen and Sullivan, Nuzum & Nuzum, for appellant.

James Z. Moore, Prosecuting Attorney; Miles Poindexter and Horace Kimball, for the State.

The opinion of the court was delivered by

FULLERTON, J.—The appellant was convicted of the crime of manslaughter. The charging part of the information on which he was tried is as follows:

"That the said defendant, Charles W. Power, in the county of Spokane, state of Washington, on or about the fifth (5th) day of December, eighteen hundred and ninety-eight (1898), did unlawfully, wilfully, and feloneously employ an instrument, a more particular description whereof is to this informant unknown, in and upon the person of one Cora Reinhart, the said Cora

Reinhart then and there being a pregnant woman, whom
he, the said Charles W. Power, did then and there sup-
pose to be pregnant, with the intent and on purpose there-
by to procure a miscarriage of the said Cora Reinhart,
the same being then and there not necessary to preserve
the life of the said Cora Reinhart, and did then and there
as aforesaid, by the means aforesaid, produce a miscar-
riage upon the person of the said Cora Reinhart, the
said defendant, Charles W. Power, then and there being
a physician and surgeon practicing his profession as such
in the county and state aforesaid; the said Cora Reinhart
being then and there, from and including the said fifth
(5th) day of December, 1898, to the seventeenth (17th)
day of December, 1898, continuously under the sole care
and custody of the said Charles W. Power and in the re-
lation of patient to the said Charles W. Power; and the
said Charles W. Power, during the entire period afore-
said, occupied the relation of physician and surgeon to
the said Cora Reinhart. And he, the said Charles W.
Power, did then and there, during the period aforesaid,
as such physician and surgeon, wilfully, feloniously, and
unlawfully neglect the said Cora Reinhart, and did then
and there wilfully, feloniously, and negligently cause the
person of the said Cora Reinhart to become, and did allow
the same to remain, externally filthy and covered with
vile and poisonous substances, and internally poisoned
and inflamed and filled with poisonous and filthy matter
and discharges, and did then and there unlawfully, wil-
fully, and feloniously neglect, fail, and refuse to cleanse
the person of the said Cora Reinhart, or to remove there-
from the poisonous discharges aforesaid, and during the
entire period aforesaid did unlawfully, wilfully, felon-
iously, and negligently place, keep, and allow to remain
the person of the said Cora Reinhart in an offensive and
unclean bed, and in offensive and unclean clothes, and in
a filthy room, filled with vile, unhealthy, and poisonous
atmosphere, and said room, clothes, and bed and the per-
son of the said Cora Reinhart then and there being
filthy, vile, and poisonous as aforesaid, by, through, and
on account of the aforesaid neglect of the said Charles

W. Power, and the aforesaid miscarriage, unlawfully and feloniously produced upon the person of the said Cora Reinhart by the said Charles W. Power as aforesaid, and by the acts and things aforesaid, the said Charles W. Power did then and there unlawfully and feloniously inflict upon the person of the said Cora Reinhart certain mortal injuries, the same being the acts and things aforesaid, by and on account of which said mortal injuries, the same being the unlawful acts of the said Charles W. Power, the said Cora Reinhart, in the county and state aforesaid, on or about the seventeenth (17th) day of December, 1898, died.

Wherefore, this informant herewith informs and charges that the said Charles W. Power, in the county and state aforesaid, on or about the said seventeenth (17th) day of December, eighteen hundred and ninety-eight (1898), did unlawfully and feloniously slay and kill the said Cora Reinhart, then and there a human being, involuntarily, but in the commission of the unlawful acts of the said defendant aforesaid, thereby committing the crime of manslaughter, contrary to the statute in such case made and provided."

The information was founded upon § 7042 of the statute (Ballinger's), which provides:

"Every person who shall unlawfully kill any human being without malice, express or implied, either voluntarily upon a sudden heat, or involuntarily, but in the commission of some unlawful act, shall be deemed guilty of manslaughter."

Another section of the statute (§ 7068, Id.) makes it an offense for any person to administer to any pregnant woman whom he supposes to be pregnant, any medicine, drug or substance whatever, or to use or employ any instrument or other means on her person, "thereby to procure the miscarriage of such woman," unless the same is necessary to preserve her life. It is first contended that the trial court erred in refusing to sustain

a demurrer to the information. The appellant calls our attention to the sections of the statute above cited, and argues therefrom that, inasmuch as the latter makes it a · substantive offense, punishable as such, for any person to administer drugs to, or use instruments upon, a pregnant woman for the purpose of procuring her miscarriage, such acts must be punished in the way the statute points out, under an indictment or information charging one or more of these specific acts alone, and cannot, therefore, be the unlawful acts which were intended to be included within the statute defining the crime of involuntary manslaughter. We cannot think this contention sound. The statute, it will be noticed, prescribes a punishment for doing these specific acts, without regard to the effect such acts may have had upon the person operated upon. The crime is completed when the prohibited acts are committed, and their effect is not made a material inquiry. Had the statute gone farther and made a death resulting from them a substantive offense, to be punished in the manner therein prescribed, it might be contended with some force that a person committing the acts causing the death would have to be informed against under the statute and punished as the statute directs. But as the legislature has made the acts punishable as acts, without reference to their consequences, we cannot think it was intended to exempt a person causing the death of another by these means from being informed against and punished under the general statutes relating to unlawful homicides.

It is next contended that the court erred in admitting certain testimony. It appeared that the deceased resided near Rathdrum, in the state of Idaho, and that immediately preceding the time of her meeting with the defendant she left her home and went to Spokane, where

the defendant resided; that while preparing for her journey she had a conversation with her sister relative to the purpose of her going. The sister was examined as a witness on behalf of the state, in the course of which she was asked the following question: "I will ask you if your sister, Cora Reinhart, made any statement to you at the time she was in the act of going and preparing to go to Spokane from Rathdrum, where she was going, and her purpose in going." This was objected to by the appellant as incompetent, irrelevant and immaterial. The court overruled the objection, and the witness answered: "She said she was in trouble, and was going to Spokane to be treated by Dr. Power." It is urged here that this testimony was hearsay, not part of the *res gestae,* and highly prejudicial to the defendant. The learned trial judge did not admit the testimony generally, nor as part of the *res gestae* of the main transaction. When ruling upon the objection he distinctly and clearly stated in the presence of the jury that it was competent only to explain the purpose of the deceased in leaving home, and as characterizing her act of going, and that he admitted it as explanatory of the nature, character and object of that act. As thus limited, we think the evidence was properly admitted. It was certainly competent for the state to prove that the defendant left her home to go to Spokane, and that she there sought the defendant and placed herself under his treatment. The preparation she made for going, her condition of health at that time, and her conduct and demeanor, were likewise matters properly admissible in evidence, as a part of the history of the case and necessary to its general understanding. On the same principle, her declarations made at the time she was preparing for the journey could be shown. They were in the nature of verbal acts, explanatory of what

she was doing and of her object and purpose, and are part of the *res gestae* of this particular part of the entire transaction. The authorities generally hold declarations of this character admissible. In Greenleaf on Evidence, § 108, it is said:

"Where a person . . .. leaves his home, . . . his declarations, made at the time of the transaction, and expressive of its character, motive or object, are regarded as 'verbal acts, indicating a present purpose and intention,' and are therefore admitted in proof like any other material facts."

In the case of *State v. Dickinson,* 41 Wis. 299, the defendant was tried for the crime of having murdered Jenny Everson in the commission of an abortion. One Mary Erickson was called as a witness, and, over the objection of the defendant, was permitted to testify to certain conversations had with the deceased immediately preceding the time the deceased left the place where they were stopping, as to where she was going and for what purpose. In these conversations the deceased stated to the witness that she (the deceased) was in a family way, that she had been to see the defendant about it, that she was going to the defendant to get medicine and a syringe, and that she had engaged with the defendant to return to his place on a subsequent day for the purpose of having instruments used to get rid of the child. The trial court instructed the jury that they might consider these declarations as evidence tending to prove the fact that the deceased had at that time the intention of having an abortion produced upon her, but that it was not evidence that the defendant had actually produced the abortion, or had engaged to do it. It was held that to admit the evidence with this restriction was not error, the court saying:

"The first inquiry is, whether the declarations of de-

ceased to Mary Erickson were admissible for the purpose of showing her intention, and as their scope and effect were restricted by the court. We are of the opinion that they were. They constituted a part of the *res gestae,* were contemporaneous with the main fact under consideration, and were so connected with it as to illustrate its character. 1 Greenl. Ev., § 108. It was certainly competent to prove that the deceased went to the house of the defendant at the time it was charged in the information the abortion was produced. Upon the authorities, her intent or purpose in going there might be shown by her declarations then made or previously made; because such declarations became a part of the *res gestae.* For it is evident the declarations were connected with the act of her going to the defendant; were expressive of the character, motive or object of her conduct; and they are to be regarded 'as verbal acts indicating a present purpose or intention, and therefore are admitted in proof like any other material facts.' "

In *State v. Howard,* 32 Vt. 380, the defendant was indicted for attempting to procure the miscarriage of one Olive Ashe, in consequence of which she died. On the trial it was shown that the deceased, in company with her sister, left home and started for a neighboring town, near where the respondent resided. "The government asked the witness what was the purpose of their thus leaving home, as understood between them at the time of leaving." The trial court overruled the objection of the defendant to the question, after which the witness answered: "I had some talk of going on a visit before I knew she was going. I and she supposed her to be pregnant, and she left Sutton to get an abortion procured, as was understood between us at the time we left." It was held that the evidence was properly admitted, the court saying:

"The declarations of Olive Ashe, as to the purpose of the journey in going to the respondent's, were properly

admitted as part of the *res gestae*. The mere act of going was equivocal; it might have been for professional advice and assistance. The declarations were of the same force as the act of going, and were admissible as part of the act."

See, also, *State v. Winner*, 17 Kan. 298; *Solander v. People*, 2 Colo. 48; *Cluverius v. Commonwealth*, 81 Va. 787; *Thomas v. State*, 67 Ga. 460; *State v. Peffers*, 80 Iowa, 580 (46 N. W. 662); *United States v. Nardello*, 4 Mackey, 503; *Harris v. State*, 96 Ala. 24 (11 South. 255); *Tilley v. Commonwealth*, 89 Va. 136 (15 S. E. 526).

The state, over the objection of the defendant, was allowed to introduce statements made by the deceased some two days previous to her death, as dying declarations. Prior to the admission of these declarations the witness was searchingly and minutely examined as to the condition of the deceased at the time and the circumstances under which they were made, not only by the counsel for the state and the defendant, but by the trial judge himself. The examination covers many pages of the record, and only a brief outline of it can be given here. Describing the condition of the deceased, the witness stated that she was very weak and in great agony; that she had no strength and had to be lifted from one side of the bed to the other; that her "hands felt terribly, . . . a clammy feeling," and that she never rallied after the conversation, but gradually grew worse until her death. Testifying as to the circumstances, the witness stated that she (the witness) had been for some time trying to get from the deceased the cause of her illness; that the deceased had previously refused to tell her, not only anything concerning the cause of her illness, but even her name; and that just preceding the conversation

in which the declarations were made the deceased called her to her bedside, took hold of her hands and made the statements. The witness further testified that in the course of this conversation the deceased said that she knew she couldn't last long unless there was something done for her; that she didn't think she would ever be taken out of the room where she way lying until she was packed out; that she could feel her strength leaving her rapidly. That when the witness tried to encourage her, telling her that she must live in hopes, the deceased answered that she had lived in hopes long enough; that "she had given up all hopes." On being examined by the defendant's counsel the witness further stated that the deceased did not say that she "believed she was going to die," or that "she could not live any longer," or use words to express her belief of her approaching death, other than those above quoted. It was not contended that there was anything in the declarations themselves which would render them inadmissible. The objection is, that it was not shown that they were made while the declarant was *in extremis*, or while she was under the consciousness of impending death. The first part of the objection is directed against the time elapsing between the making of the declarations and the declarant's death. But, while this was an element proper and necessary to be considered in determining the admissibility of the declarations, it was not of itself sufficient to require their exclusion. The rule requiring it to be shown that the declarations were made while the declarant was *in extremis* does not require that it be shown that they were made while the declarant was literally breathing her last. The rule is satisfied when it is shown that the declarant died in the course of the illness from which she was suffering at the time they were made, and that the illness from which

she was suffering was the direct and proximate result of
the original injury which the declarations tend to illus-
trate.   See the cases collected in 10 Am. & Eng. Enc.
Law (2d ed.), p. 369, note 4.   As to the second part of
the objection, it is true it was not shown that the de-
clarant said, in so many words, that she believed she was
going to die, or that she could not live longer, but this
was not necessary.   The question to be determined here
is, was the trial court justified in believing, from the na-
ture of the evidence, that the declarant believed she was
about to die, and was without hope or expectation of re-
covery?   This conclusion must be drawn from the en-
tire statement and the conditions surrounding the de-
clarant, and not from any specific words she may have
used.   Without again recurring to the record, we think
the statements and circumstances shown, justified the
trial court in the conclusion that the declarant in this
case believed she was about to die, and that from her all
hope of recovery had departed.   It was not error, there-
fore, for the court to admit the declaration in evidence.

It is next objected that the court erred in refusing to
grant the appellant's motion for a new trial.   This mo-
tion was based on the ground of newly-discovered evi-
dence.   This consists of the statement, shown by the af-
fidavit of a nurse, to the effect that the deceased, im-
mediately preceding her death, had made declarations to
the nurse tending to exonerate the appellant.   It appears
from the record that the nurse was employed to wait upon
the deceased by the defendant himself; and, while he
states in his affidavit that he had no knowledge at the
time of the trial that she would testify that the deceased
had made these declarations, it would be too much to
say that he could not, by reasonable diligence, have dis-
covered that fact.   He was at all times, prior to his con-

viction, at liberty on bail, and had every opportunity to prepare for his defense. He knew the whereabouts of the nurse, yet it appears that she was never questioned as to her knowledge concerning the matters that would be subject to inquiry at the trial. This was not the exercise of that reasonable diligence which the Code requires as a prerequisite to the granting of a new trial on this ground.

Finally, it is urged that the court erred in giving the jury the following instruction:

"When a physician undertakes to attend a sick person, the law imposes upon him the duty of directing the sanitary conditions surrounding the patient, of prescribing the proper medicines and the times and manner of taking, and whatever other appliances and operations necessary to the restoration of health. As to the question whether or not the deceased was improperly treated in these respects, you are to find from all the evidence in the case; and if you have a reasonable doubt from the evidence as to whether or not the deceased was improperly treated in these respects, then you must find the defendant not guilty."

It is objected that this is not a correct statement of the law, in that it virtually tells the jury that any neglect or improper treatment of the deceased, if they found it to exist, would be sufficient to convict the defendant, while the law is that a physician is not criminally liable unless he is guilty of gross want of skill or attention. But it will be noticed that the court did not, in this instruction, undertake to define the degree of care and skill required of a physician. This was done in the preceding instruction, and, while it is true that the word "gross" was not used, yet the jury were told that they could not find the defendant guilty unless they found that his neglect was willful and felonious. The charge, as a whole, was

a clear and concise statement of the law· applicable to the case, and could not have misled the jury.

The judgment is affirmed.

REAVIS, C. J., and DUNBAR and ANDERS, JJ., concur.