THE STATE OF KANSAS, *Appellee,* v. JAMES HARRIS, *Appellant.*

No. 18,757.

SYLLABUS BY THE COURT.

1. ABORTION—*Information—Manslaughter in First Degree.* An information alleging the use of a certain instrument to procure the abortion or miscarriage of a woman pregnant with a vitalized embryo, not necessary or medically advised to be necessary to preserve her life, resulting in her death, charges a crime which would be murder at the common law, and which is manslaughter in the first degree under section 12 of the crimes act (Gen. Stat. 1909, § 2500).

2. ——— *Same.* The averment that such instrument was used with the intent to procure such abortion or miscarriage renders it unnecessary to allege that it was without a design to effect death, the presumption in favor of the defendant being sufficient to negative an intent more malevolent and criminal than the one expressly charged.

3. ABORTION—*Consent of the Woman—Crime Committed.* Although such instrument was used with the assent of the woman, for the sole purpose of procuring an abortion or

miscarriage, still such use and purpose being immoral, violative of the law of nature, deliberate in character, reckless of life, and necessarily attended with danger to the mother and likely seriously to injure her, if her death result the common law will imply malice and hold the person so using such instrument guilty of her murder, regardless of whether she was pregnant with a quick child or with a vitalized embryo.

Appeal from Osage district court; ROBERT C. HEIZER, judge. Opinion filed November 8, 1913. Affirmed.

*A. B. Crum,* of Lyndon, and *J. P. McLaughlin,* of Osage City, for the appellant.

*John S. Dawson,* attorney-general, *C. T. Neihart,* county attorney, and *A. E. Crane,* of Holton, for the appellee.

The opinion of the court was delivered by

WEST, J.: This appeal presents the question whether the defendant was legally convicted of manslaughter in the first degree.

Section 44 of the crimes act (Gen. Stat. 1909, § 2532) makes it a misdemeanor willfully to administer to any pregnant woman any medicine, drug or substance or use any instrument or means with intent thereby to procure abortion or the miscarriage of such woman, unless necessary or medically advised to be necessary to preserve her life. Section 15 (Gen. Stat. 1909, § 2503) makes it manslaughter in the second degree to use any substance or means upon any woman pregnant with a quick child, with intent to destroy such child, unless necessary or advised to be necessary to preserve the life of the mother, if the death of such mother or child ensue. The defendant was charged under section 12 (Gen. Stat. 1909, § 2500) with causing the death of a woman pregnant with a vitalized embryo by attempting to cause abortion by the use of a certain instrument. It is contended that by sections 12 and 15 it is a less serious offense thus to cause the

death of a woman pregnant with a quick child than the death of one pregnant with a vitalized embryo. Conceding without deciding the truth of this contention, the responsibility is upon the legislature and not upon the court, and the defendant can be given no judicial relief on the mere ground of inconsistency of penalties.

But the defendant maintains that as section 12 requires that the killing would be murder at the common law the conviction was wrongful for the reason that at common law such killing was manslaughter only, and that to perform upon a woman an operation with her consent for the purpose of procuring an abortion was no offense unless the woman was quick with child, which, he asserts, is the same as pregnant with a quick child. In support of his contention he cites *Commonwealth v. Bangs*, 9 Mass. 387, which simply held that an indictment for administering a potion with intent to procure an abortion must allege that an abortion ensued and that the woman was quick with child. Bangs was charged, not with the murder of the woman, but as indicated, and the point decided was that no offense was charged, the question of assault being out of the case, because the woman was not alleged to be quick with child. As no statute was cited it must be presumed that the common law alone was considered. Our attention is also called to *The United States v. Ross*, 1 Gall. 624, in which Story, J., sitting with the district judge at circuit, in considering a charge of murder on the high seas said:

"More especially will the death be murder, if it happen in the *execution of an unlawful design,* which, if not a felony, is of so desperate a character, that it must ordinarily be attended with great hazard to life, and, *a fortiori,* if death be one of the events within the obvious expectation of the conspirators." (p. 629.)

However, the portion of opinion which counsel had in mind is doubtless the following: "If the design be to commit *a trespass,* the death must ensue in *prose-*

*cution* of the original design, to make it murder in all" (p. 629) who take part in the same transaction. While this is referred to in *Smith v. State,* 33 Maine, 48, 59, in support of the proposition that if an act intended merely to procure an abortion unintentionally result in the death of the mother it is not murder, because such death is collateral to the principal design, we are not impressed with the correctness of the application or the soundness of the reasoning which endeavors to give such meaning to the sentence quoted. Looking beyond these authorities we find that in *Commonwealth v. Parker,* 9 Met. (50 Mass.) 263, it was said by Chief Justice Shaw that "It is not a punishable offense, by the common law, to perform an operation upon a pregnant woman, with her consent, for the purpose of procuring an abortion, and thereby to effect such purpose, unless the woman be quick with child." (Syl.) In the opinion, which somewhat reluctantly follows *Commonwealth v. Bangs,* 9 Mass. 387, it was held that an indictment for procuring an abortion by the means of instruments, the woman assenting, must charge that she was quick with child. The indictment did not as here expressly charge an assault, but the unlawful and inhuman forcing and thrusting of a sharp instrument, with a wicked intent to cause a miscarriage; and it was held that while the acts set forth were in a high degree offensive to good morals and injurious to society, they were not punishable at common law. However, it was said (p. 265) that care must be taken not to confound this case with others similar in fact but within another principle, and that the use of violence upon a woman with intent to procure her miscarriage would be indictable at common law.

"So where, upon a similar attempt by drugs or instruments, the death of the mother ensues; the party making such an attempt, with or without the consent of the woman, is guilty of the murder of the mother, on the ground that it is an act done without lawful pur-

pose, dangerous to life, and that the consent of the woman can not take away the imputation of malice, any more than in case of a duel, where, in like manner, there is the consent of the parties." (p. 265.)

The common-law distinction between a mere embryo and one advanced to the state of quickness was referred to but the degree of advancement essential to mark the distinction was left undecided. The supreme court of New Jersey in *The State v. Cooper,* 22 N. J. Law, 52, held that at common law it was not an offense to procure an abortion before the child was quick, and not an assault to cause such abortion upon a woman with her consent. Numerous ancient common-law authorities were cited and considered, with the statement that in none of them can be found a reference to the mere procuring of an abortion by the destruction of a fœtus unquickened, and that by unanimous concurrence of all the authorities the crime of homicide could not be committed unless the child had quickened; but it was pointed out that the statute 4 George III made it a capital offense to cause the miscarriage of a woman quick with child, and a felony of a mitigated character to cause a miscarriage before the quickening. The charge was an attempt to procure an abortion, not murder. In *Smith v. State,* 33 Maine, 48, the charge was murder resulting from an abortion. It was held that at common law it was not an offense to procure the abortion of a woman pregnant but not with a quick child, with her consent, but by the statute of Maine it was a misdeameanor, and resulting death would be manslaughter and not murder. The opinion assumes to distinguish between destroying a child before its birth and causing a miscarriage. The indictment charged that the woman was quick with child, and that the instrument was used with intent to procure a miscarriage— not to kill the mother. The court concluded that the death was charged to have been caused in the pursuit of an unlawful design, without intending to kill, and

hence not in the execution of that unlawful design, but collateral or beside the same, a conclusion not in accord with the announcement of many other courts.

In East's Pleas of the Crown the rule is thus stated:

"Hither also may be referred the case of one who gave medicine to a woman; and that of another who put skewers in her womb, with a view in each case to procure an abortion; whereby the women were killed. Such acts are clearly murder, though the original intent, had it succeeded, would not have been so, but only a great misdemeanor; for the acts were in their nature malicious and deliberate, and necessarily attended with great danger to the person on whom they were practiced." (1 East's P. C. 230.)

In *Commonwealth v. Keeper of the Prison*, 2 Ashmead, 227, it was held that to administer a potion to a pregnant woman, for the purpose of destroying the child, which causes the death of the mother, is murder in the second degree, the charge being that of causing the death of a mother by procuring an abortion. The court declared the offense bailable, but said that by the common law it would have been murder. It does not appear from the opinion whether the woman was pregnant with a quick child or only with an unquickened embryo. In Hale's Pleas of the Crown, it is stated:

"But if a woman be with child, and any gives her a potion to destroy the child within her, and she takes it, and it works so strongly that it kills her, this is murder, for it was not given to cure her of a disease, but unlawfully to destroy her child within her, and therefore he that gives a potion to this end must take the hazard, and if it kill the mother, it is murder, and so ruled before me at the Assizes at Bury in the year 1670." (1 Hale's P. C. 429.)

From a footnote it appears that in the case referred to it was held that if a woman takes poison with the intent to procure a miscarriage and dies of it, she is guilty of self murder, whether she was quick with child or not; and a person who furnishes her poison

for that purpose will, if absent, be an accessory before the fact. Blackstone says:

"So also if one gives a woman with child a medicine to procure abortion, and it operates so violently as to kill the woman; this is murder in the person who gave it." (2 Cooley's Blackstone, 4th ed., Book IV, p. 201.)

Russell on Crimes lays down the same rule. (3 Russell on Crimes, 6th ed., p. 122.) Chief Justice Dillon in *The State v. Moore,* 25 Iowa, 128, in disposing of counsel's contention there made that the use of medicines and instruments purposely to procure an abortion resulting in the unintended death of the woman is not murder, said that it was a case of implied malice, and that "in cases of homicide, the settled doctrine of the common law is, that malice may be implied from *unlawful acts dangerous* to life, committed without lawful justification." (p. 134.) Again: "If death unexpectedly result from such an act, the crime we have seen was at common law murder, and under our statute is murder in the second degree." (p. 137.) While in that case the woman was quick with child, no mention is made of that fact in the opinion. The supreme court of Michigan in *People v. Sessions,* 58 Mich. 594, 26 N. W. 291, a case of causing the death of a woman advanced from three to four months in pregnancy by an attempt to procure an abortion, said:

"At common law life is not only sacred but it is inalienable. To attempt to produce an abortion or miscarriage, except when necessary to save the life of the mother under advice of medical men, is an unlawful act and has always been regarded as fatal to the child and dangerous to the mother. To cause the death of the mother in procuring or attempting to procure an abortion is murder at common law." (p. 596.)

The question of the degree to which pregnancy must have advanced was before the supreme court of Wis-

cons'n 'n *State v. Dickinson,* 41 Wis. 299, wherein this language was used:

"But it is said that the procuring or attempting to procure a miscarriage or abortion was not an offense at common law, if the pregnant woman was not *quick* with child and consented to the act. There are most respectable authorities in support of that view. See *Commonwealth v. Bangs,* 9 Mass. 387; *Smith v. The State,* 33 Maine, 48; *Commonwealth v. Parker,* 9 Met. (50 Mass.) 263; *The State v. Cooper,* 2 Zab. 52; *Contra Mills v. The Commonwealth,* 1 Harris, Pa. 631, 634." (p. 309.)

Then after referring to the statute and quoting from *Commonwealth v. Parker,* 9 Met. (50 Mass.) 263, 1 Hale's Pleas of the Crown, 430, 1 East's Pleas of the Crown, 230, and 1 Russell on Crimes, 6th Am. ed., p. 540, the court continued:

"These authorities show that the offense described in section 11, where the death of the mother ensued from the unlawful act, was murder at common law; and that the statute really reduced the grade of the offense to manslaughter in the second degree." (p. 310.)

In *People v. Commonwealth,* 87 Ky. 487, 9 S. W. 509, it was decided unnecessary to allege that the mother was quick with child. The court said:

"The act was not only immoral, violative of the law of nature, and deliberate in character, but reckless of life, and wrongful *per se.* The death of the woman may not have been intended; there may have been no express malice against her. Neither is there in the case of one, who, knowing that people are passing upon a street, throws a stone from a housetop, resulting in death; but yet a killing under such circumstances is not involuntary manslaughter, or a killing *per infortunium.* . . . By at least the earlier common law it appears to have been nothing less than murder, although there may have been no intention to kill the woman. . . . Conceding it to be the common law rule that one is not indictable for the commission of an abortion unless the child has quickened, yet all the authorities agree that if from the means used the death

The State v. Harris.

of the woman results, it is either murder or manslaughter." (pp. 490, 491, 493.)

In considering a charge of soliciting and inciting a pregnant woman to take certain drugs to cause an abortion it was said in *Lamb v. State,* 67 Md. 524, 10 Atl. 208, 298, that by the ancient common law it was not regarded as a criminal offense to commit an abortion in the early stages of pregnancy, but, "A considerable change in the law has taken place in many jurisdictions by the silent and steady progress of judicial opinion; and it has been frequently held by Courts of high character that abortion is a crime at common law without regard to the stage of gestation." (p. 533.) In a dissenting opinion Alvey, C. J., said: "Even at common law, an attempt to produce an abortion is held to be a misdemeanor, and it is not necessary, as it seems to have been at one time supposed, to aver in the indictment that the woman was *quick* with child; but to aver that she was pregnant with child is quite sufficient." (p. 537.) In *The State v. Reed,* 45 Ark. 333, it was decided necessary in an indictment for abortion under the statute to charge that the act was done before the period of quickening, but not under the common law, as thereunder it was a misdemeanor to cause the miscarriage of a pregnant woman, and the mere unsuccessful attempt to produce it was also indictable. Also that the apparent absurdity of holding under the statute the mere unsuccessful attempt to procure an abortion, not followed by the death of the mother or child, to be a felony before the fifteenth or sixteenth week after her conception, and only a misdemeanor if after that, was not as great as the real absurdity of holding it to be no offense at all. Bishop states the law to be that if in consequence of an attempt to procure an abortion the mother dies, or the child is prematurely born and dies from too early exposure to the world, it is murder, citing 1 East's Pleas of the Crown, 264, *Commonwealth v. Keeper of the*

*Prison,* 2 Ashm. 227, and *Commonwealth v. Parker,* 9 Met. 263, 265. (2 Bishop on Criminal Law, 7th ed., § 692.)

Wharton states that a miscarriage attempted in a way not to inflict serious injury on the mother, with no intent to kill or inflict serious injury and no likelihood of such result, resulting in death, is but manslaughter. "It is otherwise when the intent is to seriously injure the mother, or the act is likely seriously to injure her. In this case the killing is murder." (1 Wharton's Criminal Law, 10th ed., § 325.) (See, also, note to *State v. Power,* 24 Wash. 34, 63 Pac. 1112, in 63 L. R. A. 902.) In Serjeant Hawkin's Pleas of the Crown, in discussing homicides which happen in the execution of an unlawful act, principally intended for some other purpose, and not to injure the one who happens to be slain, he says:

"It is said, that if a person happen to occasion the death of another, inadvisedly doing any idle wanton action, which can not but be attended with the manifest danger of some other; as by riding with a horse, known to be used to kick, among a multitude of people, by which he means no more than to divert himself by putting them into a fright, he is guilty of murder." (1 Hawk. P. C. 104.)

At another place he says:

"It is to be observed that any formed design of doing mischief may be called malice; and therefore that not such killing only as proceeds from premeditated hatred or revenge against the person killed, but also in many other cases, such as is accompanied with those circumstances that shew the heart to be perversely wicked, is adjudged to be of malice prepense, and consequently murder." (p. 95.)

This would seem to characterize fairly well the attitude of one who procured the operation to be performed upon a young woman whose ruin he had accomplished. In *Ann v. The State,* 30 Tenn. 159, the supreme court of Tennessee in considering a charge of murdering an

The State v. Harris.

infant by administering laudanum, held that to constitute murder at the common law the killing must be with malice aforethought, which would be implied if the killing resulted from an act unlawful in itself, done deliberately and with intention of mischief, of mischief indiscriminately, and was beside the original intention of the party performing the act. This is the principle running through the decisions already referred to and was as familiar to the common law as it is to our modern thinking. Whether, therefore, it were any offense at common law to attempt or cause unnecessarily an abortion or miscarriage, by the use of instruments, it was an act dangerous in itself, likely to cause death or great bodily harm, and one actuated by wicked motives; and while we find no specific case in the older authorities of a homicide resulting from the attempted miscarriage or abortion of one pregnant but not quick with child, the decisions we have cited show that the weight of the more modern decisions is against the contention of the defendant, and justify the words of Judge Dillon that "The right to life and personal safety is not only sacred in the estimation of the common law; but it is inalienable. It is no defense to the defendant that the abortion was procured with the consent of the deceased. The common law stands as general guardian, holding its ægis to protect the life of all. Any theory which robs the law of this salutary power is not likely to meet with favor." (*The State v. Moore,* 25 Iowa, 128, 135.)

The arbitrary refusal of the common law to regard the fœtus as alive in such cases until quick was based on no sound physiological principles. Beck makes it plain that the movement recognized by the mother, and which is supposed to prove that her unborn child is alive, is merely one evidence of life, whereas unless life had existed long before the most disastrous consequences to the mother must have already been suffered. (1 Beck's

52—90 KAN.

Medical Jurisprudence, 464-467; see, also, *The State v. Emerich,* 13 Mo. App. 492, 495; 7 Words & Phrases, pp. 5888, 5889; *Smith v. State,* 33 Maine, 48, 59, 60; 2 Bouvier's Law Dict. p. 807.)

For many purposes the law regards the infant as alive from its conception. (2 Wharton's Criminal Law, 11th ed., § 781.)

The words abortion and miscarriage are or have become practically synonymous (1 Bouvier's Law Dict. p. 52; 2 Bouvier's Law Dict. p. 419; 1 Words & Phrases, pp. 20, 21; 5 Words and Phrases, p. 4530), and both are used in our statute (Gen. Stat. 1909, § 2532). While the information charges a malicious and felonious assault and the willful murder of the victim, it seems to be conceded that the instrument was used only for the purpose of causing an abortion or miscarriage, with her consent. Proceeding upon that theory the fact remains that the use of such an instrument for such purpose resulted in the death of the mother, and from the foregoing it satisfactorily appears that such a homicide would have been murder at the common law.

It is suggested that the information is bad for failure to charge in the literal words of the statute that the killing was done without a design to effect death. But the averment of the real design to procure miscarriage or abortion may fairly be said to exclude one still more malevolent and criminal. (*Brown v. The State,* 110 Ind. 486, 11 N. E. 447.)

The newness of the real question presented and its importance to the defendant and to the public furnish an excuse if not a justification for the length of this opinion.

The judgment is affirmed.