THE STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. GEORGE HERBERT, CHARLES B. WEINBERG AND WILLIAM I. GARRISON, PLAINTIFFS IN ERROR.

Argued November 7, 1917—Decided December 30, 1918.

1. A husband or wife cannot testify in a collateral proceeding to directly charge the other with crime, even where the direct charge can produce no prejudicial effect.

2. In a trial on an indictment for conspiracy, in which it was charged that the defendants entered into an unlawful and corrupt agreement to obtain, by criminal means, a divorce, and by the unlawful agreement to falsely move and maintain the suit for divorce in the Court of Chancery, testimony of the declarations and activities of some of the co-conspirators, after the date when the decree denying the divorce was made by the Court of Chancery, but pending an appeal and before a decision was reached by the appellate court, is inadmissible, since the unlawful agreement was brought to an end when the case was submitted to the Court of Chancery for decision and the criminal means, adopted by the accused to obtain the divorce, were exhausted by the giving of the testimony.

3.  Where an indictment charges that the conspiracy was to obtain a divorce by false evidence and to falsely move and maintain a suit in the Court of Chancery, the fact that the indictment further alleges that the conspiracy was to prevent and obstruct the due administration of the laws of this state and to obstruct justice cannot change the nature or widen the scope of the specific acts charged as constituting the criminal conspiracy.

4.  The nature of the corrupt agreement, and not the mere continuance of the result of such agreement, is the legal standard which must determine whether a conspiracy is a continuing one.

5.  The acts and declarations of each co-conspirator are admissible in evidence against all of the conspirators, if made and done in pursuance of the conspiracy as expressed in the indictment, and before such object has been consummated.

6.  It is wholly unimportant whether conspirators succeed or fail in the attainment of the object of their agreement, for the fact, once established, that an attempt was made to attain the unlawful object, even by legal means, or the use of unlawful means to attain a lawful object, stamps the agreement as a criminal conspiracy.

On error to the Atlantic County Quarter Sessions.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER and KALISCH.

For the plaintiffs in error, *Bourgeois & Coulomb* (*Edmund Wilson*, of counsel).

For the defendant in error, *Charles S. Moore,* prosecutor of the pleas (*Clarence E. Cole,* of special counsel), *William E. Brown, Jr.,* assistant prosecutor of the pleas (*Clarence E. Knauer* on the brief).

The opinion of the court was delivered by

KALISCH, J.  The plaintiffs in error were convicted, in the Atlantic County Quarter Sessions, of the crime of conspiracy. The judgment on that conviction is brought here for review on bills of exceptions and under section 136 of the Criminal Procedure act.  The indictment, consisting of four counts, substantially charges in three of the counts that the accused entered into an unlawful and corrupt agreement to obtain, by the criminal means set out at great length, a divorce for Helen

Knittel from her husband on the ground of adultery. The third count charged that the object of the unlawful agreement was to falsely move and maintain a certain suit, in the Court of Chancery, for a divorce from marriage between Helen Knittel and her husband.

While it is true that the first count alleges generally that the unlawful and corrupt agreement was to pervert and obstruct the due administration of the laws of this state relating to divorces from marriage between husband and wife, it is obvious that this allegation is a result predicated upon the allegation that the illegal and corrupt agreement between the accused was to obtain a divorce for Mrs. Knittel by unlawful means. And this comment applies with equal force to the second count.

The fourth count reiterates some of the recitals found in the preceding counts and charges that the unlawful agreement was for the purpose of obtaining a divorce for Helen from the marriage of her husband on the false evidence that he had committed adultery with Kathryn Abrams.

To this indictment the several defendants pleaded not guilty. Before trial, however, counsel representing the state moved for a severance of the defendants Mae and Kathryn Abrams and Helen Knittel, which motion was unsuccessfully resisted by counsel of the plaintiffs in error and Helen Knittel. The trial resulted in an acquittal of the co-defendants, Gertrude McGowan and Edmund Shaw, and in a conviction of the plaintiffs in error in manner and form as charged in the indictment. The voluminous record before us presents a large number of assignments of errors and specifications of causes for reversal based upon alleged trial errors. The case was argued, orally, for the respective parties, by learned counsel who, having obtained permission from the court, later submitted elaborate briefs.

The record discloses that the husband of Helen Knittel was a witness for the state and, against objection duly made by counsel of plaintiffs in error, was permitted by the court to give testimony in the cause incriminatory of Helen Knittel.

The record further reveals evidence tending to establish that the defendants did, as charged in the indictment, unlawfully and corruptly agree together to entrap the husband of Helen Knittel into a compromising situation with Kathryn Abrams, so that the testimony, to be given relating to the situation in which the parties were found, would give rise to the inference that adultery was committed by them, though not so, in fact, and by this deceptive means to impose upon the Court of Chancery and procure for Helen Knittel a divorce from her husband, and thereby pervert and obstruct justice; that all the defendants named in the indictment, with the exception of the two Abrams, mother and daughter, who testified for the state, and Weinberg, did appear as witnesses in the Court of Chancery, and testified pursuant to the arranged plan between them in the divorce proceedings brought by Mrs. Knittel against her husband on a charge of adultery with Kitty Murray—the name Murray being used in the petition for divorce and intended to designate Kitty Abrams; that the taking of testimony and hearing in the matter was before an advisory master, and was concluded on the 15th day of December, 1916; that on the 8th day of January, 1917, the master advised a decree denying the divorce, whereupon Mrs. Knittel appealed to the Court of Errors and Appeals, in which court the appeal was argued on March 19th, 1917, and was decided by that tribunal on June 18th, 1917, the decision being an affirmance of the decree refusing the divorce.

Now, it appears, with respect to the period between January 8th, 1917, the day when the petition for divorce was decreed to be dismissed, in the Court of Chancery, and the 19th day of March, the day when the case was argued and submitted for final determination to the Court of Errors and Appeals, and the 18th day of June, the day when the case was finally decided, by the latter tribunal, that the trial judge, against objections duly made by counsel of plaintiffs in error, received testimony, both oral and documentary, which related to the alleged acts of the alleged co-conspirators mentioned in the indictment during that period.

We find it unnecessary to refer in detail to the documentary evidence emanating from, and statements said to have been made by, the alleged co-conspirators, because the assertion that such evidence was admitted, namely, writings of an alleged co-conspirator, which had their origin between January 8th and March 17th, 1917, and statements made by the alleged co-conspirators between those dates and June 18th, 1917, is conceded by counsel of the state. The state's contention is, that such evidence was properly admissible, for the reason that the object of the conspiracy was not consummated until the Court of Errors and Appeals had pronounced its judgment on the appeal. So, that the question presented, on this branch of the case, is, Was the unlawful agreement brought to an end on January 8th, 1917, the day when the decree of the Court of Chancery was advised, or on March 19th, the day when the case was submitted to the Court of Errors and Appeals for its decision, or on June 18th, 1917, when the latter tribunal handed down its determination? For if the object of the conspiracy was consummated when the decree was advised, then, of course, the documentary evidence, consisting of letters, telegrams, &c., of Weinberg, an alleged co-conspirator, after the date of that event, could not be properly received by the trial judge as evidence and treated as such against Weinberg's alleged co-conspirators. And likewise statements and acts of Weinberg after March 19th, 1917, if the conspiracy was at an end on that date, could not be properly treated and used as evidence against his alleged co-conspirators.

An additional salient ground urged for a reversal is, that the trial judge in his charge to the jury stated as a fact proven in the case that Weinberg was a witness for Helen Knittel in her divorce case, whereas he was not. We will now proceed to examine into the merits of the propositions chiefly relied on, by counsel of plaintiffs in error, as grounds for reversal of the judgment under review in the order above presented.

*First.* The reception by the court of the testimony of Charles A. Knittel, which testimony tended to accuse his wife, Helen Knittel, in whose behalf a severance had been previ-

ously granted, with the crime of which she stood indicted, in conjunction with the plaintiffs in error, who were then on trial under said indictment, was error which requires a reversal of the judgment.

The record shows that when the husband of Mrs. Knittel was called as a witness by the state, counsel of plaintiffs in error objected to his competency to give testimony charging his wife with participation in the offence charged in the indictment against her and the plaintiffs in error, and that this objection was overruled by the court.

The husband was then allowed to testify, and it is manifest from a reading of his testimony that he clearly implicated his wife, in conjunction with the alleged co-conspirators, in the commission of the offence charged against her and them in the indictment. Mr Knittel testified that after meeting Miss Abrams on two different occasions he made an appointment to call upon her, at her apartment in the evening, at eight-thirty o'clock, and that he arrived at the rendezvous punctually at the time fixed; that he went into Miss Abrams bedroom and there wholly undressed; that Miss Abram left the room for a few moments on some pretext and then returned and stood in front of bureau with her waist off, and was arranging her hair, while he was sitting on a chair next to the bureau when Herbert, one of the plaintiffs in error, followed by Mrs. Knittel, entered the bedroom and said to Mrs. Knittel, "There is your husband, Mrs. Knittel," whereupon she said to her husband, "Give me the key to my home," and then left; that he saw Herbert, McGowan, Mrs. Knittel and Shaw, four of the defendants mentioned in the indictment, in the bedroom; that on the next morning he met the two Abrams, mother and daughter, and said to them: "Why, that was a dirty frame-up pulled off on me last night," and she says, "Oh, I wouldn't do anything like that;" that when he went home, on the night of his discovery with Miss Abrams, he found Herbert, McGowan, Shaw and his wife together, and that he told them, "This is nothing but a dirty frame-up; you can't pull anything like that off on me," and that he made these statements upon what had been told him by Phineas Long and

Claud Clark. The record further discloses that Long and Clark, in the order mentioned, followed Knittel on the witness-stand and testified that Mrs. Knittel and her companions were in the Abrams' apartment about fifteen minutes before Mr. Knittel arrived, on the evening when he was discovered in Miss Abrams' bedroom. This testimony, taken in connection with what the husband had just previously said, regarding the movements of Miss Abrams and the appearance of his wife and her companions in the bedroom, could give rise to no other reasonable inference than that Mrs. Knittel and her companions were lying in wait for that to happen, which did occur, all of which was the result of a carefully prepared plot in which Miss Abrams, Mrs. Knittel and her companions were concerned.

It was in Mrs. Knittel's interest that the plan to entrap her husband with Miss Abrams was concocted. It was Mrs. Knittel who made the inferences to be drawn from the circumstances surrounding the discovery of her husband in Miss Abrams' bedroom the basis of her charge of adultery against him in her petition for divorce, and it was she who furnished the money which was paid to Miss Abrams. Mrs. Knittel, according to the testimony of her husband, must have known that the alleged act of adultery by him with Miss Abrams was not committed, if the circumstances were such at the apartment on the evening in question as described in his testimony. The effect of his testimony was, clearly, to charge Mrs. Knittel with an indictable offence.

We have alluded to and quoted from the testimony of Mr. Knittel, *in extenso,* because counsel of the state in their brief strenuously insist that his evidence did not charge his wife directly with an indictable offence, and that, therefore, under the decisions of the courts of this state, his testimony was competent and properly admitted.

This assertion is not supported by an examination and consideration of the testimony given by Mr. Knittel and of the adjudicated cases of our courts dealing with the subject at hand.

The common law rule is stated in *Stewart* v. *Johnson,* 18 *N. J. L.* 87 (at *p.* 94), as follows: "I think, therefore, we may assume the modern doctrine to be, that the evidence of the wife must directly criminate the husband to make it objectionable; a mere tendency to criminate, as held in some early cases, is not enough to justify its rejection on the ground of public policy." This case was decided in 1840.

In 1864, in *State* v. *Wilson,* 31 *N. J. L.* 77, the like question came before the Supreme Court, arising out of facts stated by Chief Justice Beasley, as follows: "The defendants were jointly indicted for adultery. Henrietta Wagner, one of the defendants, being tried separately, was acquitted. On the trial of the other defendant at a subsequent term of the Oyer and Terminer of the county of Mercer, the husband of the female defendant who had been acquitted was called to prove that he saw the parties in the criminal act. The court below, for the purpose of the trial, admitted the witness, but reserved the question for this court whether such evidence was competent." At *p.* 79, the learned Chief Justice said: "First, then, the facts which the husband or wife is called to prove must directly criminate; it is not sufficient that they intend to impute a crime." And (at *p.* 81), in discussing *Stewart* v. *Johnson, supra,* the learned jurist says: "The object of the court was to establish a uniform and practical rule, easy to be understood and applied, and the criterion adopted was that the husband and wife were inadmissible for the purpose of directly charging each other with any offence, which in its nature was indictable. *   *   * I think this rule thus adopted should not be narrowed. My inclination would be to extend it, if that could be legally effected, so as to prevent husband and wife from charging each other with any act which is essentially infamous in general estimation; but the authorities do not warrant such an amplification, and we must administer the law as it is handed down to us."

The doctrine enunciated in the cases above referred to was approved by the Court of Errors and Appeals in *State* v. *Ware,* 35 *N. J. L.* 553, decided in 1871.

The court in that case refers to the statute of 1870 (*Pamph. L., p.* 59), which, among other things, provides that a husband or wife of any party to any trial or inquiry in any suit, action or proceeding in any court, &c., or who has any interest therein, &c., shall be competent and compellant to give evidence the same as other witnesses, except in any criminal action, or proceeding for divorce on account of adultery, or in any case of bigamy except to prove the fact of marriage, or in any action or proceeding for or on account of criminal conversation, and declares that it left the common law rule undisturbed.

The next case in which the question was again mooted in the Court of Errors and Appeals, is *State* v. *Hunter,* 40 *N. J. L.* 495. One Thomas Graham, the husband of a witness produced by the state, was the alleged accomplice of Hunter, in a homicide, and having been called as a witness by the state, had admitted his guilt. It further appears that he had been separately indicted for the murder, and had not at the time of the trial pleaded to the accusation. All that the wife testified to was that just before the murder Hunter had called to see her husband, and on one such occasions had left a card containing a request that the husband would meet him at a designated place in the city of Philadelphia. At *p.* 546, Chief Justice Beasley says: "It is altogether settled that the wife is a competent witness, when the husband is not a party in the suit, to testify to facts that merely tend to his crimination, provided the facts proved by her do not manifest that an indictable offence has been committed by him. This was the rule that received the sanction of this court in the case of *Ware* v. *State,* reported in 35 *Id.* 553."

This case was decided in 1878. The statute of 1870, with some changes in phraseology, but without altering its substance, was incorporated as section 5 of the Evidence act of the Revision of 1874, and without any further change became section 5 of the Evidence act of the Revision of 1900. *Pamph. L., p.* 363; *Comp. Stat., p.* 2222.

It was not until the passage of the two enabling statutes in 1881 that a husband or wife of the person charged with crime

was permitted to offer himself or herself as a witness on behalf of the person so charged. *Pamph. L.* 1881, *pp.* 16, 69.

Reference has been made to these statutes in order to make it clear that the rule, regarding the incompetency of husband and wife to give testimony in a collateral proceeding, to directly charge the other with an indictable offence, as declared in the Ware case and the Hunter case, has not been relaxed by this later legislation, but, on the contrary, has been emphasized by the enactments which make husband or wife competent *to testify for* each other, in a criminal proceeding, which neither could do at common law.

In *Munyon* v. *State,* 62 *N. J. L.* 1, decided in 1898, after the legislation above referred to, Chief Justice Magie (at *p.* 5), in discussing the common law rule excluding a husband or wife's testimony, says: "This contention is put upon doctrine established in this court that a husband or wife cannot testify in a collateral proceeding to directly charge the other with crime. This doctrine rests upon the ground of public policy, and will even apply to cases where the direct charge can produce no prejudicial effect. *Stewart* v. *Johnson,* 3 *Harr.* 87; *State* v. *Wilson,* 2 *Vroom* 77. But it has been determined by the Court of Errors and Appeals that evidence on the part of a husband or wife, in a proceeding between others, will be admissible to prove facts tending to the disgrace of the other, provided the evidence does not make manifest an indictable offence. *Hunter* v. *State,* 11 *Vroom,* 495; *Ware* v. *State,* 6 *Id.* 554."

For the state it is further urged that to adhere to this doctrine of public policy might result in disabling the state to establish the guilt of the accused parties. But even so that does not afford a sound reason for disregarding a settled public policy which has prevailed for centuries and has received the sanction of our highest tribunal. It is far more pernicious to the efficient administration of the law to ignore precedents than to follow them, even though they may, occasionally, work a hardship.

Firmly established precedents should not be treated as mere antiquated judicial wisdom and out of joint with modern

time, unless the reason which called them into being has ceased. It cannot be properly said that the reason, which excludes the husband or wife from giving testimony, in a collateral proceeding, to which he or she is a party, charging the other with an indictable offence, is not as sound and forceful to-day as it ever was.

Next, it is argued that Mrs. Knittel was not a party to the proceeding because a severance had been granted as to her and she was not on trial. She was arraigned on the indictment and pleaded not guilty thereto. The legal effect of the severance was not to eliminate her as a party to the indictment and proceeding, but to postpone her trial on the indictment separate from those co-defendants who were put on trial. She, therefore, remained a party to the indictment and proceeding. In this respect the present case is clearly distinguishable from the Hunter case. A different situation would have been presented here if the indictment against Mrs. Knittel had been dismissed and she discharged.

We have already pointed out that the testimony of Mr. Knittel accused his wife of an offence of an indictable nature. To solicit one to commit adultery is a misdemeanor. A conspiracy, too, is a solicitation, and something more; consequently, it falls in some measure within the rules of law which govern attempts, though it is subject to the influence of other legal principles likewise. 1 *Bish. Crim. L.,* ¶¶ 767, 768.

Lastly, it is said that the admission of Mr. Knittel's testimony was not injurious to the plaintiffs in error. We cannot entertain such a view. The testimony came illegally into the case and was used by the prosecution for the manifest purpose to give credit to material testimony, tending to establish the guilt of the accused, coming from persons who were sworn as witnesses and testified for the state, and who, admittedly, were accomplices in the commission of the crime charged in the indictment. In our judgment it served that purpose in its effect upon the jury, or, at least, it may have done so.

*Second.* We now advance to the next point urged by counsel of plaintiffs in error that the trial judge committed harmful

error in receiving against the plaintiffs in error testimony of acts of, and statements made by, alleged co-conspirators, in the absence of the plaintiffs in error, and without their consent or sanction, after January 8th, 1917, the date when the decree denying the divorce was made by the Court of Chancery.

The insistence of counsel of plaintiffs in error is, that the object of the conspiracy as charged in the indictment was fully executed when the witnesses, who were to give the testimony to be used in the divorce case, were actually produced and gave their testimony in the Court of Chancery. Furthermore, it is insisted that if the appeal taken by the party affected by the decree to the Court of Errors and Appeals, in legal effect, kept the unlawful agreement alive so as to make the acts and statements of an alleged conspirator pending the appeal evidence against his co-conspirator, nevertheless, that cannot be so as to acts and declarations of an alleged co-conspirator made after the appeal had been argued and submitted for decision to said court.

On the other hand, while counsel of the state in their brief concede that the state offered letters, telegrams and other documentary matters in evidence, and which were received as such by the trial judge, and which written matter emanated from an alleged co-conspirator and had their origin after the case was decided by the Court of Chancery, and was pending on appeal up to the time the case was argued as evidence against the plaintiffs in error, they, counsel of the state, contend that the evidence was properly received and permitted to weigh against the plaintiffs in error, on the theory that the object of the conspiracy was not fully executed until the decision of the Court of Errors and Appeals was handed down on June 18th, 1917.

From the record it appears that against objections made by counsel of plaintiffs in error Mae Abrams and Kathryn Abrams were allowed to testify as to statements made to them by Garrison and Weinberg, and as to the activities of the latter, after the date when the case was submitted to the Court of Errors and Appeals. It further appears that the court be-

low also received in evidence declarations made by Weinberg and of his activities after such date.

If the testimony of the declarations and of the activities referred to had been limited to its legal operation, as tending to establish the guilt of the persons who made the statements and were engaged in such conduct, of course, no fault could be found, for, under a well-settled legal principle, declarations and conduct of an accused may be given in evidence, even though they occur during the trial of the cause. But that was not the case here. The testimony was not confined to operate within its legal sphere.

In commenting on this testimony the learned trial judge said: "The appeal was argued on or about March 19th and decided after the 29th day of May, 1917, on which date, I understand, the indictment was returned. Weinberg paid Mae and Kathryn Abrams to stay away, in part, for the reason that he did not want them to come to Atlantic City and to testify that it was a frame-up; after January 8th and down to May 11th or 12th, there was a very large sum of money— more than $5,000, and it might be $10,000. Helen Knittel delivered that money to Weinberg, in part, for the reason that she did not want them to testify that it was a frame-up; Garrison, through Bourgeois, tried to have Mae and Kathryn Abrams testify before the grand jury that it was not a 'frame-up.'" * * * It·is to be observed that Herbert, one of the plaintiffs in error, was not connected with this. The court then followed with a comment upon a proposed affidavit, prepared by Dr. Weinberg and presented by him to the Abrams women to swear to, about four days before the divorce was finally submitted to the Court of Errors and Appeals, completely exonerating Garrison, Herbert, Helen Knittel, Weinberg and McGowan, there being no evidence that Herbert had any knowledge of or connection with the preparation or presentation of such a paper or of Weinberg's act in the matter. The court, nevertheless, in this connection, instructed the jury as follows: "In addition to these matters and the controversy about the only proper inference that can be drawn from them, there are, amongst others, sharply-defined issues

as to whether there was any corrupt agreement between the Abrams, Garrison and Herbert." * * *

It is to be observed that the trial judge, in substance, instructed the jury that it could properly consider the declaration and acts of a fellow-conspirator of the plaintiffs in error, occurring between March 19th, 1917, the date of the submission of the divorce case to the Court of Errors and Appeals, and May 19th, 1917, the day on which the indictment against the plaintiffs in error was returned into court as evidence against the plaintiffs in error.

The legal question to which the facts on this branch of the case give rise is, When did the unlawful agreement come to an end? For, if it was a continuing conspiracy, which continued, as is claimed by counsel of state, until June 18th, 1917, the day on which the divorce case was decided by the Court of Errors and Appeals, then, as a matter of settled law, the acts and declarations of one conspirator, in pursuance of the unlawful agreement, are evidential against all those engaged with him in the accomplishment of the unlawful purpose.

If frequently happens that the question as to the time when a conspiracy may be said to have been brought to an end, is a mixed question of law and fact. State *v.* Gregory et al., not reported.

In the present case the question is purely a legal one. This is the logical result flowing from the nature of the alleged criminal conspiracy.

A careful reading of the four counts of the indictment unfolds that the sole object sought by the accused was to obtain a divorce for Mrs. Knittel from her husband on the ground of adultery. A combination between individuals for that purpose was not unlawful. The statute gives the injured husband or wife the right to apply for a divorce on that ground.

The aim of the compact was to obtain a divorce for Mrs. Knittel from her husband, but the means to accomplish that purpose and resorted to by the accused were unlawful and criminal. The criminality of the agreement, necessarily, rested upon the use of unlawful means to obtain its object— the divorce.

The facts of this case present a situation where the object to be attained by the alleged conspirators was a lawful one but the means were unlawful and criminal.

This makes it necessary to distinguish the present case from that class of cases where the object of the agreement is the perpetration of a crime and to divide the proceeds thereof, or where the object is to commit an unlawful act injurious to the public, although the means used to accomplish that end were lawful.

In the present case, the means used were unlawful and criminal to accomplish the object of the agreement, which was to obtain a divorce for Mrs. Knittel.

The fact that pleader charges that the combination was also "to pervert and obstruct the due administration of said laws of this state relating to husband and wife, by conniving and seeking to entrap Charles A. Knittel into an endeavor to commit adultery," &c., adds no legal force to the indictment. The words "or to commit any act for the perversion or obstruction of justice or the due administration of the laws," found in section 37 of the Crimes act (*Comp. Stat., p.* 1757), are descriptive of the character of the act necessary to be committed, in order to make such act indictable. It would not be a valid indictment which charged in the language just quoted without setting forth the illegal act complained of. What the pleader has done, in the present case, is to set out in the indictment the results flowing from the criminal means used to accomplish the object of the agreement—that is, the divorce.

In *United States* v. *Kissel,* 218 *U. S.* 601, 607, Mr. Justice Holmes very aptly remarks: "It is also true, of course, that the mere continuance of the result of a crime does not continue the crime." *United States* v. *Irvine,* 98 *Id.* 450; 25 *L. Ed.* 193; *Am. Crim. Rep.* 334.

In *Hyde* v. *United States,* 225 *U. S.* 347, 368, Mr. Justice McKenna says: "The government makes the counter-contention that however true this may be as to accomplished conspiracies it is not true of one having continuity of purpose and which contemplated the performance of acts through

a series of years. And that such a distinction can exist, we
have seen, is decided and illustrated in United States v. Kis-
sel. And necessarily so  *   *   *. The conspiracy accom-
plished or having a distinct period of accomplishment is dif-
ferent from one that is to be continuous."

The facts of the present case, tested by these views, would
lead to the conclusion that the unlawful agreement was
brought to an end at the time the case was submitted to the
Court of Chancery for adjudication. For it clearly appears
that the criminal means, adopted by the accused to obtain the
divorce, were exhausted when the testimony was given and the
matter submitted to the court for its decision. At any rate,
in so far as to the count of the indictment charging the ac-
cused with conspiring to falsely move the Court of Chancery
to grant a divorce, the conspiracy was at an end when the at-
tempt was made.

In regard to the other counts, it is debatable ground
whether the continued effort of Mrs. Knittel and Garrison in
taking the appeal to the Court of Errors and Appeals would
have the legal effect of continuing Herbert and Weinberg in
the illegal compact, so that the acts and statements of the
former after such appeal could be properly used as evidence
against Herbert, Weinberg and others who it appears were not
concerned in the appeal.

It must be borne in mind that it is wholly unimportant
whether conspirators succeed or fail in the attainment of the
object of their agreement, for the fact, once established, that
an attempt was made to attain the unlawful object, even by
legal means, or the use of unlawful means to attain a lawful
object, stamps the agreement as a criminal conspiracy.

Before continuing this discussion any further, we deem this
to be the proper place wherein to set forth a lucid exposition
of the law of conspiracy, laid down by Lord Chief Justice
Cockburn, quoted and adopted in *Reg.* v. *Parnell et al.*, 14
*Cox Cr. Cas.* 508, by Mr. Justice Barry (at *p.* 520), as fol-
lows: "Conspiracy may be divided into three classes: first,
where the end to be accomplished would be a crime in each of

the conspiring parties, a class which offers no difficulty. Secondly, where the purpose of the conspiracy is lawful, but the means to be resorted to are criminal as where the conspiracy is to support a cause believed to be just by perjured evidence. Here the proximate or immediate intention of the parties being to commit a crime, the conspiracy is to do something criminal, and here again the case is free from difficulty. The third and last case is where with malicious design to do an injury, the purpose is to effect a wrong, though not such a wrong as when perpetrated by a single individual would amount to an offence under the criminal law."

The definition of the second class singularly and snugly fits the situation here.

It would seem, therefore, in the present case, that when the false evidence was produced and offered, in the Court of Chancery, the crime charged was complete, irrespective of the fact whether the divorce was granted or not. It is not to be overlooked that it is the nature of the agreement, not the act of the parties, that determines whether the conspiracy is a continuing one.

If the Court of Chancery had granted the divorce, and an appeal had been taken by the husband, then following out the logical sequence of the state's contention, the husband's act would have the legal effect of continuing the conspiracy. But this in the very nature of the matter cannot be so. For, at most, the appeal, taken to the court of last resort by Mrs. Knittel, aided by Mr. Garrison, might be considered as a new unlawful agreement between them to use the false evidence given in the Court of Chancery for the purpose of falsely moving the Court of Errors and Appeals to grant the divorce. But no such crime as that is charged against them in the indictment. And even if the indictment did include such a crime, it does not appear that any of the other accused persons had any connection with such appeal, or with any new agreement.

The averments in the indictment that the agreement was to pervert and obstruct the due administration of the laws of this

state and to obstruct justice, do not have the legal effect of making the unlawful agreement a continuous one, for they are limited, in their effect, by the language in the indictment to the obtaining of the divorce by false evidence and to falsely move and maintain the suit in the Court of Chancery. Instances of continuous conspiracies are those in restraint of trade to extort money and to divide the proceeds, and such acts which in their very nature carry with them continuity of action.

The present case strikingly illustrates a condition that the United States Supreme Court warns against—that is, the likelihood of unconsciously converting the result of a conspiracy into a continuing one, as here, namely, the production of false evidence in the divorce case and the use subsequently made of such evidence by Mrs. Knittel and Garrison on the appeal to the court of last resort.

If there be any doubt on the question whether the conspiracy was at an end when the Court of Chancery rendered its decision, and it be assumed that the conspiracy continued, because of the appeal taken, there can be no doubt that the conspiracy in the very nature of it must have ended on the day when the case was finally submitted to the Court of Errors and Appeals. After March 19th, 1917, there was nothing more to be done to obtain the divorce, and it will hardly be said the life of the conspiracy was extended through judicial means. But that would be the logical result of the state's position, flowing from the contention, that the conspiracy did not end until final decision of the court. Therefore, if the courts, for some reason or other, did not decide the case in a year from the time of argument, then, in conformity with the state's theory, the life of the conspiracy would be extended until the decision was handed down. The unsoundness of this view is too manifest to need any further comment.

It is not denied by the state that the acts and declarations of alleged co-conspirators made after March 19th, 1917, were admitted in evidence and used and treated as evidence against all of the accused, which was harmful error, and is an additional ground why the judgment must be reversed.

The reason for the introduction of evidence of the acts and declarations of a conspirator, after the case was submitted to the Court of Errors and Appeals for decision, is stated by counsel of the state in their brief, as follows: "The acts and declarations of each co-conspirator are admissible against all the co-conspirators if made and done before the object of the same has been consummated. In fact, they are sometimes admissible afterwards, if there is any attempted concealment of the crime."

The first part of the proposition accurately states the settled law; the second part does not. No case has been cited in support of the latter assertion. There is no well-considered case that holds that the declaration or acts of a co-conspirator made after the object of the conspiracy has been consummated is evidence against his fellow-conspirators. The logic of the situation resulting from a consummated conspiracy is opposed to such a conclusion. The unlawful agreement being at an end, each of the conspirators ceases to be the agent of the other, and, therefore, can only bind himself by his acts or declarations, notwithstanding the fact that such acts or declarations relate to concealment of the crime of the completed conspiracy.

Undoubtedly, if the indictment had contained a count, charging a conspiracy between the accused to conceal the commission of a crime, the acts and declarations of a co-conspirator would be evidence against his fellows, otherwise not.

*Third.* Another ground urged for reversal is that the court instructed the jury that the "defendants on trial and Helen Knittel all testified before the master in support of the good faith of the divorce."

For the state it is conceded that this statement of the facts was inaccurate as to Weinberg. He was not a witness and did not so testify in the divorce case. But it is insisted that this misstatement of a fact was cured by what the court said in other parts of his charge, and reference is made to what the court said at the beginning of his charge: "If the court errs in its statement of any evidence or assumes the existence of

evidence that is not actually before the jury, the jury are to rely upon their recollection and not upon the recollection of the court." And in another portion of the charge the court said: "There are some facts which seem to have been established by the evidence—I do not state that they are—it is for you to determine whether or not they are." Of course, this can only refer to disputed questions of fact. Immediately preceding the statement that "defendants on trial and Helen Knittel all testified before the master," &c., the learned trial judge was dealing with Weinberg's activities in connection with the divorce proceedings, and was apparently reading from copies of the stenographer's notes, or from his own, as is manifested by lengthy quotations from the testimony, and, therefore, it seems to us that such a statement of fact made by the court, with material before him to refresh his memory, carried with it great force and conviction, and would naturally have impressed the minds of the jury of the existence of a fact (which on account of the great length of the trial the jury might have forgotten) to such an extent as to overrule any recollection that the jury might have had of that very important and material circumstance. The statement made by the court had no foundation, in fact, and was harmful, being a material factor in the case to be weighed by the jury, as to Weinberg's connection with the unlawful agreement, and, hence, bearing materially on his guilt or innocence. And for this reason the plaintiffs in error are also entitled to a reversal of the judgment.

Judgment is reversed and a *venire de novo* awarded.