43 N.J. Super. 481 (1957)
129 A.2d 29
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM SUDOL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 7, 1957.
Decided February 1, 1957.
*482 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Archibald Kreiger argued the cause for the State (Mr. Charles S. Joelson, Deputy Attorney-General, Acting Prosecutor; Mr. John J. Bergin on the brief).
Mr. William D. Hardin argued the cause for defendant-appellant.
*483 The opinion of the court was delivered by CLAPP, S.J.A.D.
This is an appeal by William Sudol from convictions on two indictments tried together.
The first indictment charges him, his wife's sister Irene Muscosky, and her husband Walter Muscosky with assisting Eva Muszynska in performing an abortion upon Sudol's wife, Elizabeth, contrary to the statute N.J.S. 2A:87-1. Under the other indictment, Sudol, Mrs. Sudol, Irene and one Vincent Drongoski, the husband of another sister of Elizabeth, are charged with a conspiracy, as follows: to obtain back from Eva the $175 that had been paid her for the abortion; to secure an additional sum by pretending, contrary to the fact, that Mrs. Sudol was suffering from peritonitis in a hospital; to get Vincent to impersonate a police officer falsely; and not to report the commission of a crime. The jury found Sudol and Irene guilty on both indictments. The other defendants were acquitted  Eva by order of the court upon a basis that is not pertinent to the problems before us.
Sudol by his appeal raises three points. First, he claims that the State failed to prove that Mrs. Sudol was pregnant, and hence that his motion for acquittal at the close of the State's case should have been granted with respect to the indictment for abortion.
Upon an indictment for abortion made under N.J.S. 2A:87-1, it is incumbent on the State to establish that the woman is "pregnant." State v. Loomis, 90 N.J.L. 216, 217 (E. & A. 1917); State v. Clifford, 132 N.J.L. 529, 530 (Sup. Ct. 1945), affirmed 133 N.J.L. 312 (E. & A. 1945); State v. King, 133 N.J.L. 480, 481, 482 (Sup. Ct. 1945), affirmed 135 N.J.L. 286 (E. & A. 1946); State v. Gedicke, 43 N.J.L. 86, 91 (Sup. Ct. 1881); State v. Edwards, 9 N.J. Misc. 34, 36 (Sup. Ct. 1930). In this respect, the statute differs from the common law, for there an indictment did not lie unless the woman was quick with child. State v. Siciliano, 21 N.J. 249, 257 (1956). It differs, too, from the statutes in force in many jurisdictions today, including England, under which one other than the woman may be held for the offense though the woman is in *484 fact not pregnant. Annot., 46 A.L.R.2d 1393, 1404-1408 (1956); 24 and 25 Vict., c. 100, § 58 (1861); 10 Hals. Laws 731 (3d ed.); Reg. v. Goodchild, 2 Car. & K. 293, 175 Eng. Rep. 121 (1846).
On the motion for acquittal, the question presented by the New Jersey statute was whether evidence had been adduced from which a jury could legitimately draw, beyond a reasonable doubt, an inference of pregnancy. State v. Kollarik, 22 N.J. 558, 564 (1956). Under the practice, to which we adhere, that question must be resolved upon the evidence produced before the State's case had been closed. State v. Pearson, 39 N.J. Super. 50, 56 (App. Div. 1956).
We turn then to the evidence of pregnancy. Except as otherwise noted, we shall rely upon the testimony of Eva who, after being acquitted, was called to the stand by the State. The Sudols had four children, of whom (according to the opening made by Sudol's attorney before the jury) three were in an institution (an orphanage) and the fourth lived with Sudol's mother. Mrs. Sudol (calling herself Mrs. Cervas) and her sister Irene came to Eva, telling her that Mrs. Sudol had missed a menstrual period and soliciting her to perform an abortion. When Eva said she might have her period in a few days, Mrs. Sudol replied she was sure she wouldn't, because she had been given a "rabbit test." Eva said that she did not perform abortions.
Two days later the two women again called upon Eva, this time with Sudol. To Eva, Sudol said (we are, as we have mentioned, relying on Eva's testimony, and the language reflects her own rather broken English):
"I ask you be so kind and help my wife. She lost her menstruation; then we don't want to have any children. We got four. That is enough for us. I have to pay for one month for four children $160. Then I absolutely don't want any more. We can not have it. We work together, with wife. It is enough for take care of family.

* * * * * * * *
If you don't want believe my wife is pregnant, you could examine her. Then you will be sure."
Accordingly, Eva examined Mrs. Sudol manually and, afterwards, replied that she didn't appear to be pregnant. Eva *485 questioned Mrs. Sudol, asking whether she had had any signs of pregnancy, and Mrs. Sudol answered that she didn't expect signs until after the lapse of nearly three months of pregnancy. Sudol returned within a few days, again pleading with Eva to perform the abortion. Eva refused. He then offered her $175. Eva claims she turned that down, and that he then put something to her side, declaring that if she didn't help, she was "going to drop dead right now." She professes that this so frightened her that she agreed to do as asked.
The next evening Sudol, his wife and Irene appeared once more at Eva's home. In answer to Eva's inquiry, Mrs. Sudol said she had not yet had any signs of pregnancy, other than gas pains, but these had bothered her so much that she could not work (she was then employed), whereupon Eva gave her an enema to relieve the pains. Later Mrs. Sudol paid her $175 for the alleged abortion, and arrangements were made to have Eva perform the operation at Irene's home the next day. In Sudol's presence Eva gave Irene a sterilized apron and a package of instruments, including a forceps, a vaginal speculum (an instrument used for the inspection of a uterus) and a scraper or sharp curette (used for the removal of debris or placental material from a uterus).
The following afternoon Sudol was in the living room of Irene's home, and Mrs. Sudol, Eva and Irene were in the bedroom. The doors, it is to be noted, were open. Eva undertook the abortion inserting the speculum and using the scraper in Mrs. Sudol's womb. She testified that she removed a "lump of blood, very dark, like liver," but found no fetus or placenta. Mrs. Sudol, however, in her confession to the police said that Eva showed her a piece of flesh about two inches long which had been taken from her uterus. Although this testimony is mentioned in the briefs on both sides, nevertheless a short time before it was adduced at the trial there was a general objection by Sudol's attorney to a prior question, on the ground that a wife could not testify against her husband and that hence (apparently) her confession to the police could not be used against him. The *486 court ruled that each witness was to testify to what he "did separately, not involving [his or her] spouse." The ruling is not entirely clear, but we shall assume that the court held that Mrs. Sudol's confession to the police was not to be taken as binding on her husband. We therefore have decided to disregard the testimony as to the piece of flesh.
In any event, despite Eva's denial of a fetus or any placenta, she herself testified she told Mrs. Sudol as she was finishing the scraping of the uterus, "Now is clean. Nothing there except blood [as if to say that something had been there other than blood] * * * Now I am finished already." At that moment, as she removed the speculum from the vaginal canal, Sudol stood in the doorway and took a flashlight picture of Eva and the lower portion of his wife's body.
Sudol in his statement to the police puts it this way. He said he was
"not in the room when the abortion * * * was performed while [Eva] was in there with [Mrs. Sudol]. He heard a remark made, `there, honey, the pain will soon be over', and a little while later said again, `there, honey, everything is over.' At this point * * * Sudol said he decided he thought it would be a good idea to snap a picture."
The picture was received in evidence, and Sudol's attorney admitted for the record that Sudol took it and that the body which appears in the picture is that of his wife (the picture is damaging evidence on the indictment for conspiracy to obtain money from Eva).
We return to Eva's testimony. After the taking of the picture, Eva demanded of Sudol "What does this mean?" He responded "That means you did abortion for my wife; that I got evidence." Sudol took her instruments and asked for $4,000, including a return of the $175. When Eva pleaded with Mrs. Sudol to intercede, the latter started crying saying, "he wouldn't listen to me." Sudol later turned upon his wife (we observe again that this is Eva's rather broken English), "I don't want you any more; I don't need you any more; if I want woman I am going to get *487 anyone and any time. I am going to take divorce from you." Mrs. Sudol cried so loudly that Eva thought she was going to be terribly sick. Later he said to Eva, "I have no pity for nobody. I want to make easy money if I get a chance." And further: "I want just money. I am psychiatrist; I am mindreader; I know I am going to get money, as I want from you." We need not, for the purposes of this or the next point, relate more of this sordid story, as told by Eva. The defendants, when they took the stand, had a different tale to tell.
It is argued on Sudol's behalf that his wife was pretending she was pregnant, merely playing a role in a conspiracy to extort money from Eva. But in the face of the testimony referred to, it was plainly open to the jury to find to the contrary. Besides, with Eva's testimony that a scraping of the womb "hurts terrible," the jury could have doubted that she submitted to the operation merely for the purposes of extortion.
With this evidence in view, we turn to the question raised by Sudol's first point, namely, whether the County Court should have directed an acquittal on the ground that the State had not adduced sufficient proof that Mrs. Sudol was pregnant. Pregnancy is a condition beginning at the moment of conception and terminating with the delivery of the child. State v. Loomis, 90 N.J.L. 216, 218 (E. & A. 1917).
The State relies on Mrs. Sudol's statements to Eva that she had missed her menstrual period and was sure she was pregnant. There are authorities that may be said to hold that the woman's admission of pregnancy, at least under some circumstances, is sufficient to raise a jury question as to the matter of pregnancy. People v. Emery, 79 Cal. App. 226, 179 P.2d 843, 846 (App. Ct. 1947); State v. Alcorn, 7 Idaho 599, 64 P. 1014, 1016 (Sup. Ct. 1901); State v. Keester, 134 Kan. 64, 4 P.2d 679, 683, 684 (Sup. Ct. 1931); 3 Burdick, Crimes (1946), 291, 292; cf. State v. Gedicke, 43 N.J.L. 86, 88, 94 (Sup. Ct. 1881); State v. Horwitz, 108 Conn. 53, 142 A. 470, 472 (Sup. Ct. Err. *488 1928); Com. v. Leger, 264 Mass. 217, 162 N.E. 337, 338 (Sup. Jud. Ct. 1928); State v. Ryder, 80 Vt. 422, 68 A. 652, 653 (Sup. Ct. 1908). But where a woman's declaration of pregnancy is based merely on the omission of one menstrual period, can we say that it alone constitutes sufficient proof of pregnancy, warranting a denial of a motion for acquittal? There was no medical proof on the point.
We need not stop on that question. Here, in addition, we have Mrs. Sudol's assertion that she had had a rabbit test, and more than that, statements of hers indicating that the test was positive. Passing over the question whether we should take judicial notice of claims made by medical texts as to the accuracy of the test (see Report of Supreme Court's Committee on Evidence 166-167 (1955); Report of Legislative Commission on Evidence 67 (1956); see Gray's Attorneys' Textbook of Medicine (2d ed. 1940), 705, making certain assertions as to the accuracy of the rabbit test (the Friedman test) and stating that it or a variation of it "is now * * * almost invariably used for the determination of pregnancy throughout the civilized world"), we conclude in any event that we can take judicial notice that it is a widely known test. Indeed, the court below in a colloquy with counsel, and without any objection on their part, indirectly referred to the rabbit test as an "absolute" test of pregnancy.
It is asserted in Sudol's brief that statements of Mrs. Sudol to Eva as to her pregnancy and as to the rabbit test cannot bind him; that as to him they are hearsay. But no objection was made on this score during Eva's testimony. Six days earlier in the trial, there had been an objection to which we have referred in connection with the two-inch piece of flesh. But when Eva was on the stand, Sudol's attorney at one point admitted that Eva could "testify as to what [Mrs. Sudol] told her, but not as to what [Mrs. Sudol] said her husband said * * *. Anything that [Mrs.] Sudol said is all right but not as to what she claimed her husband said." Indeed, when the State sought to elicit statements made by Eva to the police containing admissions made by *489 Mrs. Sudol to Eva, Sudol's attorney objected, saying "let Eva * * * take the stand" and, at another point, "the best testimony is Eva * * * herself." The State, by putting Eva on the stand later, might be said to have been meeting this objection.
There are other circumstances here. Was there not a jury question whether Eva performed the abortion operation under duress? And if the jury could have found that she did it without any coercion, was there not a further jury question whether she (experienced as she was in these matters) had reason to believe that there was a pregnancy when she operated? Moreover, there is the lump of blood, very dark, like liver, and the question as to the size of an embryo six weeks or so of age. Furthermore, there are the so-called "gas pains."
Bearing in mind these various things, we think there was sufficient to take the case to the jury on the issue of pregnancy.
Sudol in his second point attacks the trial court's ruling that statements given to the police by each of the conspirators are binding on the others. Sudol's brief refers to six such rulings at the trial. But was there a sufficient objection? Preliminarily we should observe that it is by no means clear that the objection at the places cited in the brief had to do with the conspiracy indictment. Indeed, at one point relied upon in the brief, it appears that his attorney said expressly to the trial court that he did not dispute the ruling. However, passing that, it nevertheless definitely appears that the court's attention was not called to the point, now presented, namely, that statements of the conspirators made after their arrest, were not in furtherance of the conspiracy. An objection should be so stated as to apprise the court satisfactorily of the "grounds therefor." R.R. 4:47.
It is first to be observed that the point now advanced is supported by the authorities, that is to say, the rule is that statements of one of the conspirators made after their arrest had terminated the conspiracy, are not admissible as against a co-conspirator. State v. Costa, 11 N.J. 239, 248 (1953); State v. Simon, 113 N.J.L. 521, 529 (Sup. Ct. *490 1934), affirmed 115 N.J.L. 207 (E. & A. 1935); State v. Dougherty, 86 N.J.L. 525, 539, 542, 543 (Sup. Ct. 1915); Fiswick v. United States, 329 U.S. 211, 217, 67 S.Ct. 224, 91 L.Ed. 196, 201 (1946); Krulewitch v. United States, 336 U.S. 440, 442, 69 S.Ct. 716, 93 L.Ed. 790, 793, 794 (1949); Paoli v. United States, 77 S.Ct. 294 (1957); Morgan, "Rationale of Vicarious Admissions," 42 Harv L. Rev. 461, 464 (1929). Indeed, the State practically concedes this, and the very case cited by it to the trial court in another connection, State v. Herbert, 92 N.J.L. 341, 359 (Sup. Ct. 1918), may be said to sustain the point.
Furthermore, the trial court itself was quite aware of the principle. It charged the jury 
"* * * Under the law, where a conspiracy is once established, and until the completion and consummation of the objective in view, if the conspiracy lasts that long, every act and declaration of one conspirator in pursuance of the original concerted plan, done and in furtherance of the common objective, even in the absence of the other conspirator or conspirators, is, in contemplation of the law, the act and declaration of the other conspirators, and is, therefore, evidence against each, and each are deemed to assent to or command what is said or done by any of them in furtherance of the common objective of the conspiracy.

* * * * * * * *
But * * * whatever any of these defendants said about a co-defendant, whatever he may have said regarding his part in the conspiracy, after the perpetration of the overt act or acts and the completion and consummation of the objective, is not evidence against said co-conspirators. And that means, of course, after it has been all completed and their conspiracy is ended, they can not act or testify for each other, for their acts and deeds or words are not binding on each other after the conspiracy has ended." (Italics added)
Thus, there is reason to say that if the point had been raised below, it probably would have been sustained. The question then is, should we reverse? The plain error rule is not adverted to. R.R. 1:5-1(a); State v. Landeros, 20 N.J. 69, 73 (1955); State v. D'Ippolito, 19 N.J. 540, 548 (1955); State v. Dunphy, 19 N.J. 531, 537 (1955); State v. Haines, 18 N.J. 550, 565 (1955); United States v. Jones, 204 F.2d 745, 748, 749 (7 Cir. 1953), commenting on Rule 52(b). Federal Rules of Criminal Procedure.
*491 However, should we, of our own motion, invoke the plain error rule on a point that is fully argued? In connection with that rule (as well as with the harmless error rule) we attempt to assay the effect of the error, not upon our own minds, but upon the minds of the jury. Moreover, we have regard for the total picture produced by the evidence on both sides, including the testimony erroneously admitted. Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557, 1566 (1946).
In dealing with this whole point, we seem to be concerned only with statements to the police made by the three persons who are charged with having conspired with Sudol, namely, Mrs. Sudol, Irene and Vincent Drongoski. Vincent's confession was the only one put into evidence. But portions of the other two confessions were brought out by a policewoman who typed them, and they were used also on cross-examination of Mrs. Sudol and Irene, who denied or failed to remember most statements contained therein. Resolving doubts in favor of the appellant on his first point, we assumed above, in connection with the State's proof as to the two-inch piece of flesh, that the court ruled that Mrs. Sudol's statement to the police was not to be regarded as binding on her husband. However, there seems to have been no such limitation put upon the statement at certain points of the case. Accordingly  and again in order to resolve doubts in favor of the appellant  we will assume for the purposes of this point that her statement to the police was brought into the case as against Sudol in violation of the rule now under consideration  that is, notwithstanding that it was made after the conspiracy had come to an end.
This brings us to a consideration of all the evidence adduced by the State and the defense, including the statements of Mrs. Sudol, Irene and Vincent Drongoski. It must be borne in mind, incidentally, that the statements, which these persons made to Eva during the existence of the conspiracy and in furtherance of its objectives, are admissible as against Sudol. State v. Yedwab, 43 N.J. Super. 367 (App. Div. 1957).
*492 After surveying the entire record and analyzing with particularity the portions of Mrs. Sudol's, Irene's and Vincent's statements which were admitted into evidence, we are satisfied that it could not be said that the admission of the same worked, or may well have worked, an unjust result as to Sudol. Such evidence as was adduced thereby seems to have been a comparatively minor part of a strong case against Sudol. That being so, we should not invoke the plain error rule. State v. Haines, 18 N.J. 550, 565 (1955); State v. Picciotti, 12 N.J. 205, 211 (1953); State v. Ferrell, 29 N.J. Super. 183, 188 (App. Div. 1954).
Sudol's third and final point is that the trial court erroneously ruled that if Sudol's attorney wanted to inspect statements used to refresh the recollection of a witness, then the statements would go into evidence. However, it does not appear that Sudol's attorney did want to inspect these statements. The issue now raised was not really presented below.
Affirmed