45 N.J. Super. 236 (1957)
132 A.2d 325
THE STATE OF NEW JERSEY
v.
MEYER JONAS COLMER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 6, 1957.
Decided June 3, 1957.
*237 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Hyman Isaac, First Assistant Prosecutor, argued the cause for The State of New Jersey (Mr. H. Russell Morss, Jr., Union County Prosecutor; Mr. Cuddie E. Davidson, Jr., Special Assistant Counsel, on the brief).
Mr. John E. Toolan argued the cause for the appellant (Messrs. Toolan, Haney & Romond, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
The defendant was convicted of abortion. He appeals to this Division on the ground that the proof adduced to prove pregnancy was not sufficient to withstand the motion for a judgment of acquittal at the close of the State's case or at the close of the entire case, or in the alternative, if such evidence created a problem for determination by the jury, the guilty verdict was contrary to the weight of the evidence.
The nature of the attack upon the verdict is such as to require a careful analysis of the record.
Defendant has been a medical doctor of this State for about 27 years. He also holds a law degree but never sought admission to the bar. For many years he specialized in obstetrics and gynecology, and at the time of the events in question maintained his office in Elizabeth, New Jersey. But he testified that he was not in active practice; he was in semi-retirement, although he did some work; he was receiving some form of disability pension as a war veteran.
The victim of the abortion is one Sally Matheu Hanula, of Blairstown, New Jersey, a young woman approximately 23 years of age at the time of the trial. She was married but separated from her husband, whose whereabouts were unknown. A child had been born of that union, now four years of age. She had graduated from high school and had qualified as a medical technician after completing a two-year course in a medical laboratory school. Thereafter she worked for a year in the Newton Memorial Hospital, then for a *238 doctor in Newark, and as an X-ray technician at the Beth Israel Hospital also in Newark.
She met one Henry Hess, of Stillwater, a neighboring town between Blairstown and Newton, New Jersey, and began to go out with him about in July 1955. They engaged in sexual relations "several weeks" before September 17, and about the second week in August she "noticed" that she had missed her menstrual period. The history she gave later to Dr. Victor Burn at the Newton Memorial Hospital (which was admitted without objection) was that her periods were regular, appearing every 28 to 30 days. Believing that pregnancy had taken place her physician, Dr. Terhune, of Newton, was consulted. A Friedman test followed (performed at the Newton Memorial Hospital, again according to the history given to Dr. Burn), which she was familiar with as a medical technician and knew to be a test for pregnancy. Upon receiving the result of the test, she believed she was pregnant. Dr. Burn's history from her was to the effect that the test was positive. Following the report, about the end of August or the early part of September she discussed the situation with Hess and decided to have an abortion. Pursuant to that decision, on September 12 she withdrew $300 in cash from her savings account, a fact which was corroborated by the bank book.
In some manner, undisclosed by the record, Mrs. Hanula had obtained the professional card of the defendant containing his address in Elizabeth and telephone number. This was given to Hess who, it is admitted, telephoned at 8:38 P.M. on September 16, and talked to him for four minutes (according to the telephone company records) and made an appointment for an examination of his (Hess') "wife," the next afternoon, Saturday, at 3:00 P.M.
Hess and Mrs. Hanula drove to Dr. Colmer's office the next day. He went in first, leaving her in the car. There he told defendant that his girl friend (not his wife) was pregnant and he "would like to see if something could be done about it." In answer to an inquiry as to the length of her pregnancy, he said he believed about three weeks. *239 Then at Colmer's request she was brought into the office where she informed him that she was pregnant, "at least [she believed] she was," that she had had a Friedman test and wanted an abortion. In answer, he said it would cost $400. Thereupon she gave him $300 in cash and Hess wrote a check on a Newton bank for the additional $100. It was drawn to cash at the doctor's direction. A few days later it was endorsed by Colmer's wife and deposited in her name in their joint account.
There was very little conversation after this, although 15 or 20 minutes elapsed during which the defendant said he was sterilizing his instruments. While the sequence of events is disputed, Colmer conceded that he sterilized speculums, a sponge holder, hemostats, forceps and a tenaculum. Presumably, in view of the kind of operation performed, some cutting instrument was included also. During this waiting period, they talked briefly from time to time. On one of these occasions, while discussing the case and before he had examined her at all, according to her testimony, he told her he was "putting down on the records that it was a polyp he was removing."
After disrobing and putting on a "gown," she got on the table in the examining room. The doctor had explained that an anaesthesia called trilene would be used. She was familiar with it and apparently knew that it could be self-administered by means of a container strapped to the wrist. The gas is inhaled by the patient until unconsciousness occurs. She did this and became unconscious for some period. Apparently she revived too soon because the defendant instructed her to take some more as he would "be only a few more minutes." She complied and, on returning to consciousness, the affair was concluded and she was given an injection of penicillin in the buttock. No instructions were given to return for any further examination or treatment. That testimony was denied by the doctor, who said he requested her to return in a week or ten days. She then *240 dressed and left the office. Hess, who asserted he had been told by defendant to leave and come back later, was waiting in the car; he drove her home.
Toward the end of the following week she began to feel sick and to run a temperature. No effort was made to consult defendant and on September 23 she entered the Newton Memorial Hospital. Part of the history given to Dr. Burn on admission was that instruments had been used on her vaginally. His examination showed the cervix was patulous (open, distended); it was lacerated on the right side; there had been instrumentation and on certain movement "dark red drainage with odor emerged" therefrom. The admitting and final diagnosis "based upon the history and examination was * * * acute pelvic cellulitis with parametritis and post-abortive bleeding." Cellulitis with parametritis was defined as inflammation of the vaginal tissues and the tissues surrounding the vagina and uterus.
According to Dr. Burn, Mrs. Hanula was obviously ill when admitted. On the basis of the history and in conformity with standard practice in such cases, he made the examination in the presence of another doctor and the directress of nurses. On reaching the diagnosis referred to, from the history plus his own findings, the prosecutor's office was notified. On further questioning, the doctor said the infection could have followed the removal of a polyp and that without the history he could not say whether the operative procedure had been an abortion or for the removal of a polyp; and he could not say whether she was pregnant when the operation was performed.
After six or seven days of conservative treatment in the form of antibiotic injections, she was discharged. Thereafter, her menstrual periods resumed.
Defendant denied the commission of an abortion. His version of the conversations when Hess and Mrs. Hanula came to the office, and of his operation, was quite different. They were strangers to him; he did not know how they happened to come down from Sussex County to see him, nor how they obtained his office card. He asserted that *241 when they came in, Hess introduced Mrs. Hanula as his "wife, Sally." A history was then taken, in which she complained of vaginal bleeding or spotting at irregular intervals; also, she was concerned over the "fact that she had intercourse several weeks previously"; she was three weeks overdue and wondered if she was pregnant. There was a further complaint about pain in "the lower side, some cramps in the right side and backache." On inquiry, she denied any nausea, vomiting, morning sickness, enlargement of the abdomen or breasts, or frequency of urine. He denied that he was informed she was pregnant, that a Friedman test had been performed, that she asked for or that he agreed to perform an abortion, or that she and Hess were unmarried.
Examination was then conducted on the table. With the aid of a speculum in the vaginal canal, he found some discharge of blood around the cervix which was irritated. Then he observed a growth or polyp protruding from the mouth of the cervical canal. He was looking for softening of the cervix which is a symptom of pregnancy.
Finding no signs of conception, he advised her that she was not pregnant but that she did have the polyp condition which was acute enough to be the cause of the spotting and which should be removed. It could be done immediately in his office if she wished. She was apprehensive, but he said he could give her relief with trilene anaesthesia. Then there was discussion of the cost of the operation which was fixed at $100, including the post-operative care. She went into the waiting room to consult her "husband" and came back in a few minutes with the check for that amount. He denied asking that it be made to cash or that he received $300 in cash in addition. On receiving the check he told her it would be necessary to wait a few minutes while he sterilized the instruments.
After preparation of the trilene, which she administered to herself, and the sterilization of the instruments, he operated and cut off the polyp. The instrumentation employed in the operative procedure would leave marks on the cervix *242 which might be seen "as much as" a week later. Upon completion of the surgery, the vaginal canal was not packed but no statement was made as to whether a sanitary napkin was employed. Following an injection of 300,000 units of penicillin, instructions were given to return in a week for a check up. She never came back and he next saw her subsequent to his arrest.
Further on the subject of pregnancy, defendant's testimony is to the effect that he could not tell "one hundred percent" by a manual examination whether or not that state existed. There was no enlargement of the uterus which would lead him to believe she was pregnant, "but I would not say one hundred percent that she was pregnant." This ambiguous assertion appraised in the light of the remainder of his testimony, probably indicates a slip of the tongue and consequently we have not attributed to it any adverse probative force. He conceded that the Friedman test is given to ascertain if pregnancy exists; a positive result while not "absolute," not "one hundred percent," is corrborative of its existence. However, the emphasis of his testimony and in fact of his defense, seemed to be that when a woman's menstrual period is three or four weeks late, a doctor cannot tell "with positiveness" whether conception has taken place; "she might or might not be pregnant"; the missed period is "just one of the symptoms."
The defense produced three specialists in obstetrics and gynecology. One said in answer to a hypothetical question that a doctor could not say "with medical certainty" that a woman 22 years of age was pregnant based upon a history of intercourse and, at the time of physical examination, a failure of the regular menstrual period to appear for three weeks beyond the usual date. The second answered that such a diagnosis could not be made that early "with reasonable medical certainty," and the third gave the opinion that a "positive medical determination that the lady was pregnant" could not be made. He said also that the Friedman test is "only a laboratory test which is not absolutely positive at all." All three of them expressed the view that a fee of *243 $100 for removing a cervical polyp was reasonable, but that one of $400 would be excessive.
In rebuttal a police officer testified that when defendant was informed after his arrest of the abortion accusation against him by Sally Matheu and Harry Hess, he denied ever knowing either one of them.
Under the statute on which the defendant was indicted, proof that the abortee was pregnant at the time of the alleged abortion is essential to conviction. N.J.S.A. 2A:87-1; State v. Sudol, 43 N.J. Super. 481 (App. Div. 1957). The pregnancy intended by the Legislature is the condition which begins at the moment of conception and terminates with the delivery of the child. State v. Loomis, 90 N.J.L. 216, 217 (E. & A. 1917).
In the testimony detailed above, it appears that Mrs. Hanula had engaged in sexual relations and had missed her menstrual period for about four weeks. The cessation of menses on those facts, the defendant conceded, was a symptom of pregnancy.
We do not have in our cases a clear-cut statement that on proof so limited a jury question is presented as to pregnancy. However, in some jurisdictions it has been held that in situations involving various periods of such cessation a woman's statement that she is pregnant is admissible and carries probative force. State v. Sudol, supra, 43 N.J. Super., at page 487; State v. Rudman, 126 Me. 177, 136 A. 817, 821 (Sup. Jud. Ct. 1927); People v. Thomas, 51 Cal. App. 731, 197 P. 677, 679 (Ct. App. 1921); People v. Northcott, 45 Cal. App. 706, 189 P. 704, 707 (Ct. App. 1920); People v. Wright, 167 Cal. 1, 138 P. 349, 352 (Sup. Ct. 1914); State v. Phillips, 68 N.D. 113, 277 N.W. 609, 612 (Sup. Ct. 1938); State v. Power, 24 Wash. 34, 63 P. 1112, 1114, 63 L.R.A. 902 (Sup. Ct. 1901); and see People v. Powell, 202 P.2d 837, 843 (Cal. Ct. App.), affirmed 34 Cal.2d 196, 208 P.2d 974 (Sup. Ct. 1949); People v. Emery, 79 Cal. App.2d 226, 179 P.2d 843, 846 (Ct. App. 1947), decided after the 1935 amendment to the statute eliminating the need for proof of actual *244 pregnancy and substituting belief of defendant that the condition existed. But the evidence here is not within such a narrow compass.
Prior to the intercourse, the alleged abortee followed a regular menstrual cycle of 28 to 30 days. Moreover, she had been through pregnancy and childbirth and therefore was more capable of forming a conclusion as to the nature of the physical phenomenon, being experienced. To confirm or negative her belief that pregnancy existed, the Friedman test was obtained. As an experienced medical technician she knew it to be for that purpose. All of the physicians in the case recognize it as a measure in common use to corroborate or refute the existence of the state. And we take judicial notice that it is a test for pregnancy. Although the person who made it was not produced, the inference is inescapable that the result was positive. After being informed of the result, Mrs. Hanula and Hess discussed it and an abortion was decided upon. The history given by Dr. Burn (and admitted without objection at the trial) is to the specific effect that the test, made at the very hospital where the later treatment took place, was positive. See State v. Sudol, supra, 43 N.J. Super. 488; Kopitnikoff v. Lowenstein Bros., Inc., 24 N.J. Super. 434, 443 (App. Div. 1953). Further, according to her testimony, when the defendant was advised of her history with regard to intercourse, cessation of menses, pregnancy and that a Friedman test had been pursued, a strong inference arises that he too concurred in the conclusion that she was pregnant. The weight of that inference may be gauged by the statement he is said to have made that he would describe the operation in his records as the removal of a polyp. This, if her testimony was believed by the jury, took place before any physical examination was undertaken; and it was followed immediately by the sterilization of his instruments. Two deductions are plainly reasonable at this point; he diagnosed pregnancy and intended to abort her. Sterilization of instruments in such circumstances is evidence of such intention. People v. Berger, 131 Cal. App.2d 127, 280 P.2d *245 136 (Ct. App. 1955). And when he did use a speculum as a first or early step in the operative process and then proceeded with some cutting instrument, is there not a fair inference that what he saw, felt and cut was an early stage pregnancy?
The defendant's testimony on this particular phase of the matter is susceptible of a finding by the jury that actual evidence of conception presented itself to him. He said that after receiving the history of spotting, intercourse, cessation of menses, and that "she was wondering" if she was pregnant, he examined her. Among other things he was looking for a softening of the cervix, which would indicate pregnancy. Accepting the abortee's statement that the existence of a polyp was a fabrication of convenience, and was mentioned only before she went on the operating table, the conclusion may be drawn from the fact of examination that pregnancy was revealed to him and induced the operation. And reference may be made at this point to his denial on arrest that he ever knew Mrs. Hanula or Hess. As a doctor (and perhaps as a law graduate also) he was aware that an abortion connotes the existence and interruption of a pregnancy. His false denial of acquaintance with them furnishes some evidence of a consciousness of guilt. People v. Morris, 110 Cal. App.2d 469, 243 P.2d 66, 70, 72 (Ct. App. 1952).
Finally, we come to the hospitalization following defendant's surgical intervention. It may be noted that in the history given by Mrs. Hanula to Dr. Burn, she did not say she was pregnant. She told him only that her menstrual period had been missed, that ordinarily they were regular and that the Friedman test was positive. On these facts and her assertion that on September 17 she had been examined and instruments had been used on her vaginally, plus his finding of evidence of instrumentation and cervical and uterine infection, he concluded that she was suffering from post-abortive bleeding. Of course, the doctor accepted her history as true and added it to his findings in reaching that diagnosis. Aside from the absence of objection, the situation is the same as if the same facts, which were proved at the *246 trial directly or circumstantially, were given to him in a hypothetical question. We cannot conclude that his diagnosis lacked probative force on the issue of pregnancy.
Our analysis of the evidence has led us to the conclusion that both at the close of the State's proof and at the end of the entire case there was adequate proof to warrant sending the issue of pregnancy to the jury for determination. And the verdict reached thereon we cannot say is contrary to the weight of the evidence.
The judgment is affirmed.